1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 2:03-cr-0042-MCE-EFB P

12                 Respondent,

13        vs.

14   SHANGO JAJA GREER,                     FINDINGS AND RECOMMENDATIONS

15                 Movant.

16

17        Movant Shango Jaja Greer is a federal prisoner proceeding pro se with a motion to vacate,

18   set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[1]  On April 7, 2006, Greer was

19   convicted by a jury of conspiring to conduct the affairs of an enterprise known as the Pitch Dark

20   Family (or PDF) through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d);

21   and conducting the affairs of that enterprise through a pattern of racketeering activity, in violation

22   of 18 U.S.C. § 1962(c).  Greer now seeks post-conviction relief on the grounds that his trial and

23   appellate counsel rendered ineffective assistance.  Upon careful consideration of the record and

24   the applicable law, the undersigned recommends that Greer's § 2255 motion be denied.

25   /////

26   /////

27   _____

28        [1]  This motion was assigned, for statistical purposes, the following civil case number:
     2:12-cv-00397-MCE-EFB.

                                              1

## I. Overview

Greer presented the following overview of his criminal proceedings in his opening brief on appeal, which this court includes here, in part:

> The government sought and obtained [movant's and others] convictions for their alleged involvement with the Pitch Dark Family, a Vallejo group which the government alleged was a criminal enterprise. There was, however, no dispute that there was also a group that wrote and performed rap music by the name of the Pitch Dark Family (hereinafter, "PDF"), and that the persons the government contended were gang members were also members of PDF, the rap group. The predicate acts charged were, in the main, old state cases – some as much as a decade old at the time of trial – that the state authorities had declined to prosecute.
>
> Although [movant and others] hotly contested the validity of the predicate acts, the overarching issue in the case was whether or not the PDF was a group of rappers consisting of friends who had grown up together in Vallejo, some of whom earned a living by selling drugs, or whether PDF was, as the government alleged, a coordinated criminal enterprise that controlled an area of west Vallejo.

ECF No. 1184-10 at 12-13.

## II. Procedural Background

On January 29, 2003, an indictment was filed charging Greer and various other persons with participating in a street gang known as the Pitch Dark Family, an enterprise conducting its affairs through a pattern of racketeering activity. ECF No. 1. Count One charged Greer and five others with conducting the affairs of an enterprise (PDF) through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), and alleged nine racketeering acts, as follows: (1) the murder of Jewel Hart; (2) the attempted murder of Jason Hickerson; (3) the murder of Keith Roberts, aka York; (4) the murder of Richard Garrett; (5) possession of cocaine base for sale on or about April 26, 1997; (6) the murder of Devin Russell; (7) possession of cocaine base for sale on November 29, 1998; (8) the murder of Larry Cayton; and (9) conspiracy to distribute illegal narcotics. *Id.* at 1-8.

Count Two alleged that Greer and seven others conspired to conduct the affairs of an enterprise (the PDF) through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). *Id.* at 8-9. Count Four alleged that Greer committed the murder of Larry Cayton in

aid of racketeering activity, or aiding and abetting racketeering activity, in violation of 18 U.S.C. § 1959(a)(1) and (2). *Id.* at 11-12.[2] The case went to trial against Greer and co-defendant Jason Keith Walker in November 2005. Trial concluded in March, 2006.

On April 7, 2006, the jury returned verdicts finding Greer guilty on Counts One and Two and not guilty on Count Four. ECF No. 681. With respect to Count One, the jury found that Greer: (1) committed the attempted murder of Jason Hickerson on July 15, 1994, or aided and abetted in the commission of that crime; (2) committed the crime of possession of cocaine base with the intent to distribute on April 26, 1997, or aided and abetted in the commission of that crime; and (3) committed the murder of Larry Cayton on April 8, 2000, or aided and abetted in the commission of that crime. *Id.* With respect to Count Two, the jury found that: (1) the pattern of racketeering activity agreed to by Greer included an act involving murder; (2) the pattern of racketeering activity agreed to by Greer included an act involving attempted murder; (3) the pattern of racketeering activity agreed to by Greer included an act involving possession of a controlled substance with the intent to distribute; (4) the pattern of racketeering activity agreed to by Greer included an act involving conspiracy to distribute illegal narcotics; (5) Greer committed the attempted murder of Jason Hickerson on July 15, 1994, or aided and abetted in the commission of that crime; (6) Greer committed the murder of Keith Roberts on August 3, 1994, or aided and abetted in the commission of that crime; (7) Greer committed the crime of possession of cocaine base with the intent to distribute on April 26, 1997, or aided and abetted in the commission of that crime; (8) Greer committed the murder of Larry Cayton on April 8, 2000, or aided and abetted in the commission of that crime; and (9) Greer committed the crime of conspiracy to distribute illegal narcotics. *Id.*

/////

/////

/////

---

[2] Count Three of the Indictment was not charged against Greer. ECF No. 1 at 9. Accordingly, during Greer's trial and on his verdict forms the parties and the court referred to Count Four of the indictment as Count Three. ECF No. 12 at 2 n.3.

**III. Factual Background**[3]

    **A. Facts relating to the Enterprise**

Several witnesses testified at Greer's trial about the origins of Pitch Dark Family. Jason Hickerson testified that he lived on the west side of Vallejo from 1990 to 1993, and bought and sold drugs there. Reporter's Transcript (RT), Dec. 7, 2005, 80-81. Hickerson said it was important to know who sold drugs on the west side so you would "know what you were up against." *Id.* at 81. He agreed that "you could get into trouble if you didn't know who was dealing drugs on the west side" and explained that this was "[b]ecause you would be dealing in someone else's territory." *Id.* at 81-82. In those days, the drug trade on the west side was controlled by the Five Deuce Waterfront Gangsta Crips (hereinafter Five Deuce), also known as West Side and City Park Crips. *Id.* at 82. That group included Charles White, Leroy Vance, Charles McClough, Louis Walker, Shawn Brown, and Marc Tarver. *Id.* at 83-85. Sometime around 1991-92, Five Deuce started calling itself Pitch Dark Family (PDF). *Id.* at 86. PDF consisted of the same members plus movant Greer ("G.O."), Jason Walker ("Fade"), Eric Jones, Anthony Monroe ("Tone"), Elliott Cole ("LL"), Oscar Gonzales, Arnando Villafan, Ricardo White, Demetrius Thompson, and Tito Manuel. *Id.* at 86:19-89:19. Hickerson testified that in 1992 and beyond, he personally bought crack cocaine from PDF members Jason Walker and Marc Tarver. *Id.* at 90:6-92:8.

Hickerson also testified that PDF sold drugs in an area from Sutter Street to Santa Clara Street and from Tennessee Street to Florida. *Id.* at 94. Generally, only PDF members could sell drugs in PDF territory. *Id.* at 95. Hickerson explained that he was allowed to occasionally sell drugs in PDF territory, even though he was not a PDF member, because he lived on the west side and purchased his drugs from a PDF member. *Id.* at 96-98.

/////

---

[3] The factual background that follows is derived from Greer's § 2255 motion, the statement of facts contained in the government's opposition to Greer's § 2255 motion (ECF No. 1184 at electronic pgs. 16-33), the statement of facts contained in Greer's opening brief on appeal (ECF No. 1184-10 at 7-39), and this court's review of the trial record. The facts are presented in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011).

Dante Webster also testified about the membership of Pitch Dark Family and its character as a street gang. Webster lived in West Vallejo for most of the period from 1991 to 2005. RT, Dec. 15, 2005, at 25. Webster testified that, during the 1990s, he was one of the leaders of a group called The Folks (also known as the Sutter Street Crew or Gutter Street), that sold drugs in an area adjacent to PDF territory. *Id.* at 42, 44-45. Webster testified that there were other gangs on the west side that sold drugs and that these gangs divided up the area and generally got along with one another. *Id.* at 45, 46. Because he socialized with members of the other gangs, he was familiar with other gangs and their membership. *Id.* One of these gangs was Pitch Dark Family, which was also known as the Five Deuce Waterfront Crips and City Park. *Id.* at 46-47. Webster identified some of the members of PDF, including: Shango Greer ("G.O."), Jason Walker ("Fade"), Charles White ("Shady"), "EJ Rabbit", Mark Tarver ("Bowlegs"), Tone Monroe, Louis Walker ("Lou Dog"), Elliott Cole ("LL"), and Oscar Gonzales. *Id.* at 53-55. Webster testified that PDF members associated with the Crips "from time to time" and frequently wore Crip colors, which were blue, black and brown. *Id.* at 58-59. PDF members also spoke disrespectfully of the Bloods. *Id.* at 75-76.

Webster also testified that from time to time members of PDF - usually "Shady" (Charles White) - would ask for a meeting to discuss what was going on in the neighborhood - that is, whether there was anyone new in the neighborhood trying to sell drugs "[b]ecause if no one knew you, you wasn't supposed to be around there." *Id.* at 59. Webster explained that only PDF members or their friends could sell in PDF territory. *Id.* at 60-61. Webster also described an incident at Nations Burgers where PDF member "EJ Rabbit" was shot after he confronted an Oakland drug dealer. After the shooting, PDF called a meeting to discuss retaliation because the Oakland dealer was selling drugs on PDF turf. *Id.* at 77-81. Webster cooperated with the government in this case in order to obtain sentencing leniency in connection with his own federal drug case. RT Dec. 15, 2005, at 111-12, 166-76.

Prosecution witness Sedrick Perkins was a member of the Sutter Street Crew who had been selling cocaine and heroin on the streets of West Vallejo since he was eleven years old. RT Jan. 26, 2006, at 6364-65. When asked if he had ever heard of the name Pitch Dark Family, he

answered, "Yeah. They was a gang too." *Id.* at 6365. Perkins' identification of the members of PDF and its territory was consistent with the testimony provided by other witnesses. He said that the leaders of PDF were Shango (Greer), Fade (Walker), and Shady (Charles White) and that the younger kids like Nando and Oscar were not high up in the hierarchy. *Id.* at 6366. Perkins also corroborated the testimony of the other witnesses that PDF had originally been called the Five Deuce Waterfront Crips but then changed its name to Pitch Dark Family. RT Jan. 26, 2006 (p.m.), at 6475.

Witness Anthony Freeman met movant Greer in 1985 when they were both in the fifth grade and they became very close friends. *Id.* at 6551-52. During the next four years, Greer and Freeman sold drugs together and Freeman met Greer's other friends, who also sold drugs. *Id.* at 6552-54. These friends included Fade, Shady, Eric Jones and [Marc] Tarver. *Id.* at 6554. Freeman testified that during the period 1984 to 1989 Greer and his other friends were associated with a group called the City Park Thugs, also known as Pitch Dark Family. *Id.*

Freeman also testified about the Nations Burgers incident in which PDF member Eric Jones (aka EJ Rabbit) was shot. Freeman testified that Greer told him the shooting was precipitated when Jones confronted out-of-towners who were selling drugs in the neighborhood. RT Jan. 30, 2006, at 6612-13.

Witness Derrick Shields moved to west Vallejo in 1990 and continued to live there up through the date of Greer's trial in 2006. RT Feb. 2, 2006, at 7071-72. When he first moved to west Vallejo, he met several individuals who were members of a group called City Park, including Shango, Jason, Tone, Marc, Louis, Butch (Marlin), Meech (Demetrius Thompson), Bowleggs (Marc Tarver), EJ Rabbit (Eric), Nando, and Oscar Gonzales. *Id.* at 7072-76. When he first heard about Pitch Dark Family in the early 1990's, Butch told him that it was the name of a rap group. *Id.* at 7077. Later, the same people who were in City Park adopted the name Pitch Dark Family. *Id.* at 7078. Shields testified that the members of PDF sold drugs in an area bounded by Alabama, Louisiana, Ohio and Sonoma streets, mainly at the Beacon gas station and the burrito truck on Ohio. *Id.* at 7079-81. To sell drugs there you had to have PDF's permission. *Id.* at 7081.

Witness Derrick Washington moved to Vallejo in 1989 and began associating with a gang called The Folks. RT Jan. 18, 2006, at 5683-84. He also got to know individuals who were members of Pitch Dark Family, including Fade, Greer, Lou, Bowleggs, and Dogg. *Id.* at 5685. He witnessed several of them selling rock cocaine on the west side of Vallejo in the early to mid-90's. *Id.* at 5686.

Witness Jason McGill testified that, growing up in west Vallejo, he was familiar with the gang scene in that area. RT Jan. 11, 2006, at 5215. He identified numerous individuals as being members of a gang known as Pitch Dark Family, including movant Greer, "Fade" (Jason Keith Walker), "Shady" (Charles White), Oscar [Gonzales], Arnando Villafan, Elliott Cole, Lou Walker, "EJ Rabbit," and "Bowleggs" (aka Mark). *Id.* at 5213-15. McGill testified he was an "associate" of PDF and "hung around with them," even though he was not a member himself. *Id.* at 5216. He personally witnessed these members selling guns and drugs. *Id.* at 5216-17. McGill was allowed to sell drugs in PDF territory, even though he was not a member of PDF, because he lived in West Vallejo. *Id.* at 5217-18. Other people who were from West Vallejo but were not members of PDF were also allowed to sell there. *Id.* at 5218.

McGill further testified that the leaders of PDF appeared to be Jason Walker ("Fade") and Lou Walker; he described Greer and "Shady" as the "muscle." *Id.* at 5218-19. He was present on a couple of occasions in the mid-90's when PDF got together to discuss gang business. *Id.* at 5220. On those occasions, the topics of discussion were "who's getting money in the neighborhood" and "people they could rob." *Id.* at 5220-21. He stated one such meeting occurred at a garage located behind an apartment complex next to the home of Jason Walker's grandmother, where Mr. Walker lived. *Id.* at 5243-44.[4] In 1994, McGill saw Jason Walker frequently and often saw him with a firearm. *Id.* at 5222-24. During this time he saw Greer "every now and then" and, on a couple of occasions, saw him with a firearm, which he carried in his front waistband. *Id.* at 5224.

/////

---

[4] Greer testified that Jason Walker's grandmother did not have a garage. RT Feb. 21, 2006, at 8028-29.

On cross-examination, McGill testified that he had previously been a member of the 415 prison gang and that he was currently in custody on a parole violation. RT Jan. 11, 2006, at 5236-37. He had previously been convicted of giving false information to a peace officer, possession for sale of crack cocaine, and inflicting corporal injury on a spouse. *Id.* at 5331-32.

Witness Charles McClough lived in West Vallejo all his life and was familiar with the gang scene in the 1980s and 1990s. RT Jan. 12, 2006, at 5484. McClough admitted that he is a Five Deuce Waterfront Crip. *Id.* at 5574. He first became associated with the Five Deuce Waterfront Crips in 1984, when he was about 11 years old. *Id.* at 5484-85. McClough identified the other gangs on the west side as Downtown, City Park, and Pitch Dark Family. *Id.* at 5486. McClough identified the following individuals as members of Pitch Dark Family: "Bowleggs," "EJ Rabb," "Tone," "Fade," Lou Walker, Greer, Elliott Cole, "Shady," Oscar Gonzalez, and Arnando Villafan. *Id.* at 5504-06. McClough personally witnessed PDF members selling guns and drugs (cocaine and heroin) on the west side. *Id.* at 5507-10. McClough had a lengthy criminal history, beginning at age 11 when he was sent to the California Youth Authority and the state mental hospital. *Id.* at 5483-85; RT Jan. 17, 2006 (afternoon session), at 5620-21.

Natalie Thomas, nee Fitzgerald, testified that she saw Greer sell drugs to her brother on one occasion. RT December 20, 2005, at 4538-42. She stated that Jason Walker told her he was a member of PDF. *Id.* at 4573.

Government Exhibit 1304B is a letter written from prison by Jason Walker to PDF member Oscar Gonzalez. RT Feb. 23, 2006, at 8330. Part of the letter states: "It's hella crips down there. The 415 is still trying to recruit a nigga. Negative. 707 4 life. CPG. WSV. PDF till I die." *Id.* at 8331-333. During his testimony, Greer admitted that the statement "its hella crips down there" meant that there were a lot of members of the Crips gang in prison. He also agreed that the phrase "415 is trying to recruit a nigga. Negative" meant that the 415 prison gang was trying to recruit Walker but that he had said no. Greer further admitted that "707" was a reference to Vallejo's area code. *Id.* With regard to the meaning of "CPG" Greer testified as follows:

/////

1  Q: All right. And "CPG," what's that.

2  A: City Park G.

3  Q: City Park G?

4  A: G.

5  Q: City Park G?

6  A: Yes

7  Q: What's the "G" stand for?

8  A: G.

9  Q: It's just a G?

10  A: Yes.

11  Q: You don't know what that stands for?

12  A: It's just a G.

13  Q: Doesn't stand for City Park Gangsters?

14  A: It could.

15  Q: But in this context, you just don't know?

16  A: I don't know what he – you know, he could have said City Park Gangster. City Park G.  He

17  could, you know. It has a lot of different meanings.

18  *Id.* at 8332-33.

19      Greer was also asked about Government Exhibit 1410, a letter that he had written, which

20  also concluded with the initials "CPG." RT Feb. 28, 2006, at 8444.  The following exchange

21  occurred:

22  Q: And "CPG"?

23  A: City Park G, yes.

24  Q: City Park G still stands for City Park G?

25  A: Yeah. It could be gangsta. You call it what you want.  It's a G.

26  Q: Does it stand for "gangsta"?

27  A: It's an open ended question.  It can stand for a lot of things.

28  . . . .

Q: It does not stand for "City Park Gangsta"?

A: It can.  Some people refer to it as that.

Q: You refer to it that way, don't you?

A: Sometimes.

Q: Jason Walker refers to it that way also; right?

A: Sometimes.  Nothing wrong with being a G.

RT Feb. 28, 2006, at 8447-48.

Prosecution expert witness Steven Fowler, a former gang intelligence officer from the Vallejo Police Department, testified that a street gang was "a group of people, general [sic] three or more that are bound together by some type of social need, whether they grew up in the same neighborhood or not, that are involved in committing criminal acts that generally put the safety of the citizenry at risk."  RT Feb. 15, 2006, at 7780-81.  He testified that usually a gang controlled the "criminality" in an area, or "turf," and that this was necessary to successfully sell drugs.  *Id.* at 778-82, 7786.  He opined that street gang members frequently were involved in drug sales but usually were not highly organized.  *Id.* at 7784-85.  He explained that street gangs commonly engaged in acts of violence to protect their turf and prevent others from revealing criminal gang activity to the police.  *Id.* at 7786, 7790-91.  Fowler acknowledged that Vallejo street gangs were not large and that members might sell or possess only ounces of controlled substances.  *Id.* at 7787-88.

Fowler further testified that PDF was a street gang in West Vallejo from approximately 1993 to 2001 and that movant Greer and Jason Walker were members.  *Id.* at 7794-95.  His opinion in this regard was based in part on "street intelligence," which consisted of conversations with people on the street, including victims, and his own observations of graffiti, tattoos, clothing with logos or monograms, and photographs obtained in searches.  *Id.* at 7793.  Fowler also testified that he saw baseball caps with the initials "PDF" or the name "Pitch Dark Family."  *Id.* His opinion was also based, in part, on the fact that Elliot Gus Cole, Eric Jones, Louis Walker, Arnando Villafan, Oscar Gonzales, and Mark Tarver had admitted in connection with their guilty pleas that they were "members of Pitch Dark Family which was an association of individuals

engaged in gang-related activities." *Id.* at 7794. Fowler further relied on a section of graffiti near the Beacon gas station in which the monikers of numerous individuals, including movant Greer, Jason Walker, and White, had been etched into wet cement. RT Jan. 25, 2006, at 4881-87. He also relied on the letter from inmate Jason Walker to PDF member Oscar Gonzalez, described above. RT Feb. 15, 2006, at 7797-99. Fowler interpreted that letter to mean that a California prison gang was trying to recruit Jason Walker, but he declined because he felt loyalty to PDF, his gang. *Id.* at 7798-99. Fowler also testified that the leaders of the PDF were Greer, Jason Walker, White and Louis Walker. *Id.* at 7795.

In its opinion on Greer's appeal, the U.S. Court of Appeals for the Ninth Circuit concluded that the trial court did not abuse its discretion when it determined that Fowler's testimony was "reliable and relevant and thus admissible," and that it was not "an abuse of discretion for the district court to admit the substance of the co-defendants' admissions to being PDF members as a basis for Detective Fowler's opinion." *Walker*, 2010 WL 30699, at *1.

As noted by Greer in his appellate brief, "there was no evidence that PDF had rules, a steering committee, regular meetings or even that they regularly stood up for each other." ECF No. 1184-10 at 24. Further, Dante Webster testified that that PDF members did not share their profits from drug sales. Rather, each person kept his own profits. RT December 15, 2005 (afternoon session) at 132.

### B. Racketeering Acts

#### 1. <u>Murder of Jewel Hart</u>

Elliott Cole shot and killed Jewel Hart in 1994. RT Jan. 19, 2006, at 5936. Devin Russell testified against Cole at his preliminary hearing. *Id.* at 5936-37. Cole later pled guilty to involuntary manslaughter. *Id.* at 5947.

#### 2. <u>Attempted Murder of Jason Hickerson</u>

Lakisha Gooch testified that on July 15, 1994, she was driving a car in which Jason Hickerson was a passenger. RT Dec. 7, 2005 (a.m.), at 17-20. A PDF member named Eric Jones (EJ) approached the car and asked Hickerson why Hickerson took "his friend's stuff." *Id.* at 20. Gooch dropped off Hickerson and drove away because EJ was clearly agitated with Hickerson

and she was afraid for her children, who were also in the car. *Id.* at 21-22. Gooch's car was then pursued by a grey car occupied by Greer, EJ and some other men she did not know. *Id.* at 22-24. Greer asked Gooch where Hickerson was. She told him she'd dropped Hickerson off and didn't know where he was, and then got away from them. *Id.* When she went home a short time later, the same people who had been in the car were waiting for her across the street. *Id.* at 24-25. PDF member Ricardo White approached Gooch from the group and asked where Hickerson was, told her they were angry at Hickerson, and advised her to keep Hickerson out of her car because he stole a gun and some drugs. *Id.* at 25-30. White told Gooch "they" had guns, specifically a sawed-off shotgun. *Id.* at 29-30. White then searched Gooch's house to see if any of "their" stuff was there, after which White got in his car and left. The other men (Jones, Greer, and the others in the car she did not know) walked away down the street. *Id.* at 30:9-31:7.

Witness Cindy Smith was outside her house that same day and heard a shotgun blast. *Id.* at 67-68. She looked in the direction of the noise and saw a "bluish-gray car, probably a Nissan Maxima or something of that style," with "two black men in the front of the car," and "a shotgun at the window ledge." *Id.* She couldn't tell whether or not there was anyone in the back of the car. *Id.* at 68-69.

Dante Webster testified that within a week before Jason Hickerson got shot, he saw Hickerson with a machine gun. RT Dec. 15, 2005 (a.m.), at 84. Webster said that the day Jason Walker's car had been broken into "he was walking around the neighborhood pretty hot about Hickerson." *Id.* Walker asked Webster if he'd seen Hickerson because Walker thought Hickerson "had broken into his car and stole some guns and drugs from him." *Id.* at 84-85.

Greer testified that Hickerson was known for "being a thief." RT Feb. 21, 2006, at 8006. He testified that on the day of Hickerson's shooting he, Greer, was driving a gray Honda Civic. He and another car full of people started following a car in which Hickerson was a passenger. *Id.* at 8009. Greer caught up to the car and spoke with Gooch, asking where Hickerson was because Hickerson had stolen something from Greer's father. *Id.* at 8012. Gooch drove off and Greer proceeded to Hillcrest Park, because he knew Hickerson lived in the area. RT Feb. 22, 2006, at
/////

12

8194. He testified that, to his knowledge, Gooch did not lie about anything during her testimony. *Id.* at 8208.

Jason Hickerson testified that in July 1994 he broke into Jason Walker's car, and took a bag of crack cocaine, an Uzi submachine gun, and a sawed-off shotgun. RT Dec. 7, 2005, at 100-102. On the day he was shot, Hickerson was riding with Gooch when they saw members of PDF, including Walker and Greer, standing in front of a business. *Id.* at 102-103. A grey Honda Accord was next to the group. *Id.* at 103. At a nearby stoplight, Eric Jones, a member of PDF, approached Gooch's car and confronted Hickerson in a hostile manner, looking back toward the grey Honda. *Id.* at 104. Hickerson directed Gooch to let him out, after which the group in the grey car, including Greer, Walker, Jones, and Marcus Taplin, spotted him and engaged in a short chase before Hickerson hid himself in a garage. *Id.* at 104-106. After he left the garage, the group in the grey car found him again. *Id.* at 111. Greer, Walker, Jones, and Taplin others jumped out of the car; Walker had a "38," and Jones had a shotgun. Greer was unarmed. *Id.* at 111-112. As Hickerson was running away, he was shot in the back. *Id.* at 112.

Police interviewed Hickerson at the hospital, where he provided a false name and denied knowing who shot him. *Id.* at 114-15. At the time he testified, Hickerson was facing charges of cocaine possession, which carried a three year, eight month sentence. *Id.* at 134. As a result of his testimony, the District Attorney indicated he would recommend a two year sentence. *Id.* at 135.

PDF member Jones was convicted of the attempted murder of Jason Hickerson in state court. *Id.* at 47.

### 3. Murder of Keith Roberts

On August 3, 1994, at approximately 3:30 a.m., Vallejo police officers responded to a shooting that occurred at the intersection of Sonoma and Louisiana in Vallejo. RT Jan. 3, 2006, at 4698. Upon arriving at the scene, officers saw a black male, later identified as Keith Roberts, lying face down in the street. *Id.* Roberts had sustained multiple gunshot wounds and was pronounced dead at the scene. *Id.* at 4702. Officers collected nine .38 Super automatic shell casings at the crime scene. *Id.* at 4711-12. These casings surrounded Roberts' body. *Id.* at 4700.

13

Forensic analysis matched the .38 super shell casings to shell casings recovered from the scene of a carjacking that occurred two weeks later in the same area as the Roberts murder. RT Jan. 12, 2006, at 5459. The shell casings also matched one of the weapons used to kill Richard Garrett (Racketeering Act Four). *Id.* The .38 Super is a fairly rare caliber ammunition. RT Jan. 5, 2006, at 4978.

Joseph Thompson testified that on August 19, 1994, two black males came into his gun store and purchased .38 Super ammunition. *Id.* at 4978-79. Thompson recalled that these two individuals had been in the store a week or two earlier. *Id.* at 4979. At their request, he ordered a magazine for a Llama .38 Super Auto handgun. *Id.* at 4980. After the two men departed the store, Thompson copied down the license plate of the brownish-colored Chevrolet the men were driving. *Id.* at 4982. He forwarded this information to the Vallejo Police Department. *Id.* at 4983.

On September 1, 1994, officers were conducting surveillance on the Chevrolet described in the preceding paragraph. *Id.* at 5022. While on duty, they observed a Buick pull into the parking lot and park next to the Chevrolet. *Id.* at 5023, 5026. The officers then saw Jason Walker and another black male exit the Buick and enter an unknown apartment. *Id.* at 5023-5024. Approximately 45 minutes later, Walker came out of the apartment complex and opened the trunk of the Chevrolet. *Id.* at 5024. After a few minutes, Walker returned to the apartment. *Id.* at 5025.

Charles McClough testified that in March, 1995, Walker and White told him that the two of them, along with Shango Greer and Marc Tarver, were involved in the Keith Roberts homicide. RT Jan. 12, 2006, at 5513, 5515, 5517-18. According to McClough, White told him that several of them participated in the shooting. *Id.* at 5518:12-17. McClough testified that the subject of Roberts's murder came up again approximately a week later at Marc Tarver's residence, where White, Tarver, and Walker again talked about the killing. *Id.* at 5519. The subject later came up a third time, again at Tarver's residence, with the same participants, except that Greer was also present. *Id.* at 5520-21. During one of these conversations, it was revealed that while several different people in the group had shot Roberts, Walker had fired the final, fatal

shot. *Id.* at 5528-29. Neither Greer nor Walker disputed White's characterization of the events. *Id.* at 5526-27.

Derrick Washington testified that Walker admitted his role in the Roberts homicide. According to Washington, Walker said he had shot Roberts on Louisiana Street because Roberts had attempted to steal drugs from him. RT Jan. 18, 2006, at 5698-99.

### 4. Murder of Richard Garrett

On August 28, 1994, at approximately 10:50 p.m., Richard Garrett was shot and killed on the sidewalk adjacent to the Beacon gas station on Sonoma Boulevard. RT Jan. 4, 2006 (p.m.), at 4767-71. Forensic examination revealed that Garrett was shot both with a .25 caliber and a .38 Super auto. RT Jan. 12, 2006, at 5458-59. Forensics determined that the same .38 super used in the Garrett homicide was used to kill Keith Roberts earlier in the month. *Id.* at 5459. That weapon was also used in a carjacking that took place in the same area on August 17, 1994. *Id.* at 5458-59. Forensic examination also revealed that the .25 caliber weapon used in the Garrett homicide was used in the attempted homicide of Lawrence Rude. *Id.* at 5459-60.

Derrick Washington testified that he witnessed the murder of Richard Garrett. RT Jan. 18, 2006, at 5688. Washington testified that on the night of the murder, his girlfriend at the time, Teresa Williams, drove Washington, Greer, Louis Walker, and Tarver to the Beacon Gas Station on Sonoma Boulevard. *Id.* at 5689-91. They observed Garrett appear to be arguing with Greer's girlfriend. *Id.* at 5693. Greer, Walker, and Tarver got out of Williams's car and approached Garrett. *Id.* at 5691. Garrett and Greer got into a fight, and Garrett hit Greer on the head with a beer bottle. *Id.* at 5693. Washington knew that Louis Walker was in possession of a chrome .25 caliber semi-automatic pistol, and Washington saw him shoot Garrett twice with the pistol. *Id.* at 5694-95. Washington also saw Jason Walker cross the street, walk over to Garrett, and shoot him once with a black .38 caliber automatic. *Id.* at 5695-96. Washington had seen Walker in possession of that gun several times previously. *Id.* at 5696.

Jason McGill testified that he was across the street from the Beacon gas station when he heard a commotion across the street. RT Jan. 11, 2006, at 5226. He saw Greer and Garrett wrestling with each other. *Id.* at 5226-27. While they were wrestling, McGill saw Jason Walker

approach Garrett and then shoot him with a black semiautomatic pistol from a distance of five or six feet. *Id.* at 5227-28. He only saw one shot, but heard two more after he turned to run away. *Id.* at 5228. McGill testified that the second two shots sounded different than the first shot, as if they came from a smaller weapon. Id. at 5228-29.

Sharolette Simpson testified that she accompanied Nishetia Jones (Greer's girlfriend) to the Beacon station and was present when Garrett was killed. RT Jan. 5, 2006, at 4904-05. Simpson saw Jones arguing with Garrett outside of the Beacon station when a black car arrived at the gas station. *Id.* at 4909. Greer approached Jones and Garrett from the direction of the car and started arguing and fighting with Garrett. *Id.* at 4911-12. Simpson saw several other people approach the scene from the direction of the car and begin to attack Garrett as well. *Id.* at 4913-14. Simpson then saw a person whom she later identified as Louis Walker shoot Garrett twice. *Id.* at 4915-18.

Jason Hickerson testified that he spoke with PDF member Willis Nelson about Garrett. RT Dec. 7, 2005 (afternoon session), at 60-62. Nelson told Hickerson that Garrett had previously shot Nelson and that Garrett was selling drugs in PDF territory. *Id.* at 62. Nelson told Hickerson that he had "killers on the payroll." *Id.* at 63. Hickerson testified that, according to Nelson, Garrett, who was not a member of PDF, was selling drugs in the gang's territory and refused to stop when warned to, prompting threats of violence from PDF. *Id.* at 59. Hickerson relayed this threat to Garrett, who ignored it and continued to sell drugs in PDF territory. *Id.* at 60. *See also* RT Dec. 7, 2005 (morning session) at 129-131.

Two days after the Garrett killing, Dante Webster had a conversation with Jason Walker about what happened at the Beacon Station. Walker told Webster that Garrett was "out of pocket," meaning that he was "in violation" or "he did something he wasn't supposed to do." RT Dec. 15, 2005, at 86-87. Walker also said that that's "how the West get down." *Id.*

### 5. <u>Murder of Devin Russell</u>

On January 29, 1998, at approximately 2:30 a.m., Devin Russell was shot with a shotgun at the intersection of Sonoma Boulevard and Kentucky Street, which is in PDF territory. RT Jan. 19, 2006, at 5927. Prior to being admitted to emergency surgery, Russell told the Vallejo Police

Department (VPD) that he had been shot by someone he knew, but he did not mention the name of that person. *Id.* at 5930.

Corporal Herndon of the Vallejo Police Department was the first officer to arrive at the scene. *Id.* at 5883. He observed that Russell had suffered several shotgun wounds and was having a hard time breathing; his eyes were starting to roll back in his head. *Id.* Based upon these observations, Herndon told Russell, "Dude, you are going to die, tell me what happened." *Id.* at 5884. Russell indicated that a young Mexican male named Oscar was present during the shooting, and that a black man who was with Oscar was the shooter. *Id.* at 5885.

Uvonda Parks testified that she saw Charles White shoot Russell with a sawed-off shotgun. RT Jan. 24, 2006 (afternoon session), at 6186, 6204, 6206. According to Parks, Oscar Gonzales and others were present during the homicide, and Gonzales gave White the shotgun. *Id.* at 6202-03. Parks testified that she approached White, Gonzales, and the others as they were confronting Russell and asking him "where's the money." *Id.* at 6191-93. Parks heard Russell repeatedly beg the three men to believe him that he "wouldn't do you no wrong" and "never would rob you." *Id.* at 6200-6201. Russell also pled with Parks to vouch for him. *Id.* at 6199-6200. The crowd formed a circle around Russell, at which point both White and Gonzales attempted to hit Russell with their fists, but missed. *Id.* at 6201.

Gonzales disappeared for a few moments and then reemerged a few minutes later. *Id.* at 6201-02. Gonzales then walked over to White and they appeared to speak to each other. *Id.* at 6203. Soon afterward, White displayed a sawed-off shotgun, pointed it at Russell, and fired. *Id.* at 6204, 6206. At this point Parks turned to leave the scene and heard a second shot, but did not see who fired it. *Id.* at 6208. Parks then saw White, Gonzales, and their colleagues all approach Russell and kick him as he was on the ground. *Id.* at 6209-6210. After the killing, White caught up with Parks and followed her home. *Id.* at 6210. White told Parks that Russell was killed because he had been a "snitch." *Id.* at 6211-12.

Parks later contacted the police, who sent detectives to interview her. RT Jan. 24, 2006, at 6220-24. She gave the police White's street name, but falsely told them that a nonexistent man
/////

17

named "Tray" participated in the shooting. *Id.* Parks refused to participate in the photographic lineup process. RT Jan. 24, 2006, at 6225.

Derrick Shields testified that prior to Russell's murder, White told him he planned to "get" Russell because Russell had testified against PDF member Elliott Cole in the Jewel Hart homicide case. RT Feb. 2, 2006, at 7135-37. Shields observed White and Gonzales together at the latter's home around 11:40 p.m. on the night Russell was killed. *Id.* at 7140. The following day, Shields again saw White and Gonzales near Gonzales's house. *Id.* at 7141-42. White and Gonzales bragged about having "got that fool," a reference to Russell the night before. *Id.* at 7142:6-19.

Mickalla Oliver, who was dating Russell at the time, broke off the relationship because she had learned that Russell would be targeted for testifying against Cole, which frightened her. RT Jan. 31, 2006 (morning session), at 6775-76. Charles McClough testified that Elliott Cole told him that "something needed to happen" to Russell to punish him for testifying against Cole in the Jewel Hart homicide, which resulted in Cole going to prison. RT Jan. 12, 2006, at 5530. According to McClough, White and Arnando Villafan told him that White shot Russell with a 12-gauge shotgun. *Id.* at 5532-34. McClough was told that White's initial plan was to shoot Russell from the roof overlooking an alley where others were leading Russell. *Id.* at 5534. When White tried to shoot Russell from the roof, however, the shotgun jammed. *Id.* at 5534-35. After White fixed the jam, he shot Russell twice. *Id.* at 5535.

Sedrick Perkins testified that before Russell's murder, Greer warned him not to associate with Russell because Russell was snitching. RT Jan. 26, 2006 (morning session), at 6371-72. Perkins saw White with a sawed-off shotgun a few months before Russell's murder. *Id.* at 6372-73. About half an hour after Russell was killed, Perkins saw White and Cole a few blocks from where Russell was killed. *Id.* at 6375-76. White was carrying an army bag that looked like it had a shotgun inside and he remarked that they "got that snitch." *Id.* at 6376-77. Cole said "that's how we do it in the West." *Id.* at 6377. Cole made similar statements to Perkins again a couple weeks later when they were talking about the Russell killing. *Id.* at 6378.

/////

Emily Garcia, Gonzales's cousin, testified that the night Russell was killed, Gonzales, White, and two friends were at Gonzales's house shortly before the murder. RT Jan. 24, 2006 (afternoon session), at 6165-66. Dorothy Jansen, Gonzales's aunt, testified that after the shooting she saw Gonzales, White, and Villafan going up the stairs of Gonzales's house. *Id.* at 6159.

### 6. <u>Murder of Larry Cayton</u>

On the morning of April 7, 2000, the Redwood Credit Union in Novato, California, was robbed. RT Jan. 26, 2006 (afternoon session), at 6503-04. The perpetrators wore ski masks and gloves, *id.* at 6508, and announced that they carried guns, *id.* at 6506. After entering the bank, they told everyone to get down, got behind the teller line, and started taking cash from the teller drawers. *Id.* at 6504, 6506. The robbers took approximately $15,000 from the bank. *Id.* at 6509. As they made their escape, their car was followed by two witnesses. *Id.* at 6523-27. At some point, the robbers leapt out of the car and fled on foot. *Id.* at 6528-29. The police arrived after the robbers had fled the scene. *Id.* at 6531.

In March 2000, Greer, Jason Walker, Charles White, and Larry Cayton visited Anthony Freeman, a friend of Greer, and expressed interest in buying a car Freeman owned. *Id.* at 6557-59. Greer, Walker, and White, along with Mark Tarver and two other unidentified men, returned a second time to view the car and discuss a purchase. *Id.* at 6559-60. Approximately one or two weeks later, the car disappeared from Freeman's house. *Id.* at 6560-61. Sometime later, after the bank robbery, Freeman told Greer that law enforcement had inquired about the car. *Id.* at 6561-62. Greer responded that Freeman should tell the FBI that the car was stolen, and instructed Freeman, "Don't worry about anything because you didn't do anything." *Id.* at 6562.

Mickalla Oliver, the girlfriend of Larry Cayton, told law enforcement that when she and Cayton were together Cayton would point out banks and indicate which ones he would rob and which ones he would not rob. RT Jan. 31, 2006 (morning session), at 6743. He would articulate the reasons to her why a particular bank would be a good or bad target. *Id.* at 6743-44. She also testified that Cayton and Greer were together most of the time during the days before the robbery of the Redwood Credit Union. *Id.* at 6746-50.

/////

19

Shortly after the April 7 robbery at the credit union, Oliver was traveling from Vallejo to Novato on Highway 37. *Id.* at 6754. Oliver saw Cayton driving on Highway 37 in the opposite direction, toward Vallejo, in Oliver's car that she had let him borrow the day before. *Id.* at 6754-55. Later that day, Oliver asked Cayton where he was that morning and he told Oliver he was at home the entire morning. *Id.* at 6757-58. Oliver confronted Cayton in front of Greer and told him that she had seen him driving her car on Highway 37 toward Vallejo earlier that morning. *Id.* at 6758. Cayton and Oliver then went outside so they could talk on the porch. *Id.*

Cayton told Oliver that he did what he had to do because he was "tired of being broke." *Id.* at 6759. Oliver then asked him what he did with her car and Cayton told her that her car had not been involved in what he had done. *Id.* at 6759. Cayton then told Oliver not to tell Greer anything about the incident and suggested a story to explain to Greer why Cayton and Oliver had to speak in private on the porch. *Id.* at 6759:20-6760:7.

The next morning, Oliver returned to work in Novato. *Id.* at 6765-66. Oliver testified that while she was at work she saw an article in the local newspaper about the bank robbery that had occurred the previous day in Novato. *Id.* at 6766. Oliver recognized a photograph of the car depicted in the article as belonging to Greer. *Id.* at 6767-69. Oliver recognized Greer's car because during the time she lived at Lee Street she had seen the car parked there on a number of occasions. *Id.* at 6768. Greer made comments in her presence indicating that the car was his. *Id.* at 6768.

Larry Cayton was killed in Oakland on the morning of April 8, 2000. RT Jan. 31, 2006 (afternoon session), at 6864. Connie Phillips, who allowed Cayton to stay at her residence temporarily, testified that the afternoon prior to Cayton's death, she arrived home from work to find Cayton and Greer at her apartment watching a movie. *Id.* at 6859. At some point they left the apartment, although Cayton returned later that evening for about five minutes to retrieve some clothes. *Id.* at 6860. At about 4:00 a.m. the following morning, Phillips heard knocking at her front door. *Id.* at 6861. Phillips's boyfriend, Irwin Crews, went to see who was at the door. *Id.* Crews testified that he opened the front door and found Greer, who told him that he had left an
/////

article of clothing at the apartment. *Id.* at 6883-84. Greer went to a closet and looked around briefly before leaving. *Id.* at 6884-85.

Approximately twenty minutes later, Cayton came into the apartment through the back door. *Id.* at 6862. Cayton then shut the door to the bedroom where Phillips and Crews were located. *Id.* Phillips heard footsteps and muffled voices of at least two other men with Cayton. *Id.* at 6862-63. Phillips was unable to tell who these two men were. *Id.* at 6863. Phillips testified that at one point Cayton said, in an agitated tone, "Don't even come at me like that." *Id.* at 6863-64. Cayton and the men left the apartment shortly thereafter. *Id.* at 6864:5-6.

At approximately 5:30 a.m. on April 8, Clifford Rosa, a homeless person, was camped underneath a freeway overpass on 29th Street in Oakland. RT Mar. 1, 2006 (afternoon session), at 8675. Rosa observed a light blue Ford Taurus carrying three people turn a corner, pull over, and turn its lights off. *Id.* at 8676. The occupant of the front passenger seat walked to the rear door, pulled out the passenger by the collar, and shot him. *Id.* at 8680. When the victim fell to the ground, the shooter stood over him and fired several more rounds into him. *Id.* at 8685. The driver then said, "We got to get out of here," the shooter got back into the vehicle, and the vehicle left the area. *Id.* at 8686. Rosa flagged a passing CHP officer and told him what had happened. *Id.* The victim was later identified as Larry Cayton. Rosa described the shooter and the driver as Caucasian or light-skinned. *Id.* at 8676-78. Rosa admitted, however, that he was ingesting two dime bags of heroin a day during that time period. *Id.* at 8692-93. He also had trouble seeing things at a distance. *Id.* at 8721-22.

At about 4:00 p.m. on that same day, Phillips was informed by the Oakland Police that Cayton had been shot and killed. RT Jan. 31, 2006 (afternoon session), at 6864. Two days later, on Monday, Phillips and Crews stayed home from work. *Id.* at 6886; 6864-65. That day, Greer and a companion paid a visit to Phillips's apartment to find out what Phillips and Crews knew about Cayton's death. *Id.* at 6886-87. Two days later, on Wednesday, Phillips and Crews went back to work. *Id.* at 6867-68; 6887. On that day, Phillips's home was broken into. A key was used to unlock the back door, but because there was a chain across the door the intruder still had

/////

to force his way into the residence. *Id.* at 6887-88. Cayton was the only person who had a key to the back door. *Id.* at 6869-70.

Although there was money out in the open in Phillips' residence, as well as valuable electronics, the only thing taken by the intruder was the video Cayton and Greer had been watching the afternoon before the murder, as well as a few rap CDs by local artists. *Id.* at 6871-72. The only portion of the residence the intruder disturbed was the closet Cayton used to store his clothes and belongings. *Id.* at 6889. Phillips and Crews could not tell if anything had been taken from this closet. *Id.* at 6890. They were, however, able to ascertain that no other portion of the residence had been disturbed, and that other than the video and CDs nothing else had been taken. *Id.*

Derrick Shields testified that he met Greer and Cayton in prison and they discussed having committed bank robberies. RT Feb. 2, 2006 (morning session), at 7091-92; 7096-7100. Shields and Cayton spent a good deal of time together in the late winter and early spring of 2000, after they both had been released from prison. *Id.* at 7100-01. The afternoon after the Redwood Credit Union robbery, Shields encountered Cayton at a gas station, where Cayton inquired about purchasing a large quantity of marijuana from Shields and showed Shields $1,500 in cash he proposed to use to buy the drugs. *Id.* at 7101-03.

Shields learned of Cayton's death the next morning, from Elliot Cole. *Id.* at 7105. Later that day, Greer approached Shields and told him that he felt he had no choice but to kill Cayton. *Id.* at 7107-08. Shields also testified that before Cayton's death, Greer had complained that Cayton was starting to talk too much to other people about confidential information. *Id.* at 7107-08.

Shields cooperated with the government's investigation of this case. He was in custody on May 9, 2000, on unrelated charges when the FBI interviewed him about the murder of Larry Cayton. ECF No. 1184-1, at 2. Ex. A (FBI-302). The FBI arranged for Shields to be released from custody for two weeks for the purpose of wearing a wire on Greer, Walker, White, and others, in order to get information about PDF and the Cayton murder, after which Shields was returned to custody and completed his sentence. RT Feb. 2, 2006 (afternoon session), at 7158-59;

7147-48.  During one of these wired calls, Shields discussed the Cayton homicide with Greer,
Greer stated that Cayton was talking to various women about their "business," which Greer
considered unacceptable.  ECF No. 1184-2; RT Feb. 2, 2006 (afternoon session), at 7116-19.
During this tape-recorded conversation, Greer also told Shields, "I'd do the same thing again . . .
if it all came down to it."  ECF No. 1184-2 at 3.

Following the Cayton homicide, there was an extensive investigation by both the Oakland
Police Department and the FBI.  When Mickalla Oliver confronted Charles White about Cayton's
death, White asked Oliver for Cayton's cell phone (which White had already given to the police),
and then made her promise that she wouldn't snitch on them.  RT Jan. 31, 2006 (morning
session), at 6777-79.  Oliver was afraid for her life and left the state of California.  *Id.* at 6780:10-
20.

Anthony Freeman testified that Greer left California and went to Philadelphia in the
summer of 2000 to live with his brother there.  RT Jan. 26, 2006 (afternoon session), at 6564.
According to Freeman, Greer told him that it was "getting hot" in Vallejo as a result of the police
and FBI investigation into the Cayton homicide, and Greer wanted to "let it cool down a little
bit."  *Id.*  After Greer's return to California, Freeman had several contacts with him.  Greer,
White, and Marc Tarver came to see Freeman in July 2000.  *Id.* at 6565.  Greer told Freeman that
Cayton was "gone," but declined to provide any other details because Freeman didn't "need to
know about it."  RT Jan. 30, 2006 (morning session), at 6583.

### 7. Greer's Possession of Cocaine Base

Eric Teed, a cashier at Palace Billiards in Vallejo, testified that on April 26, 1997, he
heard several gunshots and saw a man get into a Mustang driven by another person and drive
away.  RT Dec. 13, 2005, at 10-16.  He gave a description of this man to the police when they
arrived.  *Id.* at 17.  The police later stopped the Mustang.  *Id.* at 18.  Greer was seated in the rear
seat, behind the front passenger, Jason Walker was seated behind the driver, and Arnando
Villafan was seated next to the driver.  *Id.* at 76.  Police discovered two bags containing cocaine
base under the right front passenger seat, directly in front of Greer.  *Id.* at 77-79.  Police seized
$53.00 from Greer, $243 from Villafan, and $184 from the driver of the vehicle.  *Id.* at 81, 108.

23

No money was taken from Jason Walker. *Id.* at 108. At trial, Greer denied that the drugs were his. However, he acknowledged that he was convicted of possession of cocaine base in connection with this incident. RT Feb. 22, 2006, at 8079-80.

## C. The Defense Case

The following summary of the defense case is taken from the opening brief on appeal filed by Greer and his co-defendant, Jason Keith Walker.

> The defense theory was that the PDF was a rap group, not a street gang. The defendants and other PDF members were struggling to become rap artists. RT 7090-91, 7315-17. Derrick Shields had written and recorded a song with Mr. Walker. RT 7325. Mary Downs, who ran "Murderdog," a magazine devoted to rap music, testified that PDF appeared in Murderdog in 1993 or 1994. RT 8799. She vaguely recalled the rap group, but believed it had not been successful, not an uncommon occurrence. RT 8799, 8816.
>
> Appellants also sought to raise a reasonable doubt as to the truth of the charges. With few exceptions, the government witnesses were highly unreliable. In some instances, they were themselves suspected in the crimes about which they testified. The defense also presented testimony that disputed the version of events put forth by government witnesses.
>
> For example, the defense presented evidence that Connie Townley, who testified about the Roberts murder but claimed that she did not witness the shooting, had previously admitted, both to FBI agents and a defense investigator, that she was an eyewitness to the homicide. Although she could not positively identify the shooter, she previously stated that she had seen a single shooter get out of the car that was chasing Roberts and fire several shots into him. RT 8224-25, 8530, 8540-42. Townley also had previously identified "E" as Eric Webster and made statements that the vehicle chasing Roberts was similar to his. RT 8525, 8532-33, 8543. Townley's prior statements thus contradicted McClough's testimony that several people were involved in shooting Roberts, as well as the government's theory that three people stood over the victim and took turns shooting him as he lay on the ground.
>
> The government's theory that multiple defendants shot Roberts also was contradicted by the testimony of Henry Younger, a local accountant, who was working in his office when Roberts was killed. He heard several gunshots, fired in rapid succession, too quickly for the gun to have been passed around. RT 8664-65.
>
> Many of the government's important witnesses lacked credibility. Hickerson, McGill, Perkins, Webster, and Shields all had lengthy criminal histories, belonged to rival gangs, and made numerous inconsistent statements. *E.g.* 12/7/05 78-82; 12/15/05 RT 115-18, 194; RT 5210, 5236-49, 5331-32, 5366-74, 5384-86, 5483-85, 5620, 5624. Derrick Washington committed perjury while trying to

frame Greer for shooting Larry Rude. RT 5711-12. Washington tardily admitted that he was involved in the shooting, but not before he falsely testified before a federal grand jury. RT 5703-06, 5715-31. Witness testimony also supported an inference that Washington, rather than Jason Walker, was the second shooter of Richard Garrett. *See supra* at 22-23. Two witnesses placed Washington at the scene, and testified that the shooting occurred shortly after he joined the altercation. RT 4837-38. Accordingly, Washington had a powerful motive to inculpate the defendants.

Webster was a suspect in the shooting of Eric Jones, a friend of Shango Greer's. RT 8902. McClough had a grudge against White and a lengthy history of serious mental problems. Furthermore, Sedrick Perkins testified that McClough had been shunned by other West Vallejo gang members, after it was revealed that he was gay. RT 6406-07, 6438-39. Furthermore, after first testifying for the government, McClough testified for the defense that when White made the statements about the Roberts murder, White also told McClough that he was lying. RT 8552-53.

Uvonda Parks was particularly unbelievable. *See supra* at 26-27. In addition to making up a person who allegedly participated in the homicide, she was an admitted drug dealer, with a history of providing false information to law enforcement.

Shango Jaja Greer took the stand in his own defense. Having lived in west Vallejo since he was five, Mr. Greer knew many of the codefendants from school, Little League, and Pop Warner football. RT 7931-32. Mr. Greer was incarcerated in the California Youth Authority from the end of 1989 until July, 1992, making it impossible for Dante Webster to have met Mr. Greer in 1991 as he testified. RT 7938. While he was in CYA, Mr. Greer became opposed to drugs. "I seen the effect I [sic] was having on my community." He never sold drugs after he was released from CYA. RT 7944-7945. Some of the friends that he grew up with joined the Crips, but Mr. Greer did not, although he continued to associate with them. RT 7949.

In 1993, Mr. Greer moved to Sunnyvale and then to Palo Alto. In 1997, when his mother was diagnosed with cancer, he returned to Vallejo. After a prison term, he moved back to Palo Alto. RT 7974, 7975.

Mr. Greer became involved with music at a young age. His mother and his uncle were singers, his brother is a rapper, and Mr. Greer has been writing rap music since he was in his early teens. RT 7942. Within a few months of getting out of CYA, Mr. Greer and his friends took the name "Pitch Dark Family" for their rap group. Greer testified: "We never conspired to be a gang, sell no drugs. All we do is make music." RT 7962. Greer testified that PDF did not cease to exist in 2001, but "That is basically when we were at our peak . . . [I]n 2000, 2001, we were all home, working with different individuals. We had compilation albums coming out . . . I was . .. touring with my brother. We were doing all kinds of things together." RT 7963.

The PDF published a number of rap songs and performed in Vallejo. Mr. Greer toured with his brother in Texas, Florida, Louisiana, and Los Angeles. RT 7977. While Mr. Greer was in Los Angeles, promoting a PDF demo CD, he had some PDF hats made up which he occasionally passed out at shows. RT 7979.

When Cayton was murdered in Oakland, Mr. Greer was in Vallejo. Late that same evening, Anastasia Ingram, Mr. Greer's wife, picked Mr. Greer up in Vallejo and took him back to East Palo Alto. The next day, she was present with Mr. Greer when he got a phone call informing him that Mr. Cayton had been murdered. RT 8475.

Mr. Greer denied having anything to do with the murder of Larry Cayton. RT 8168, 8177. He denied involvement in the Redwood Credit Union robbery, which the government claimed was the motive for the Cayton murder. Mr. Greer testified that he and Cayton were "good friends," and were housed together in the same dorm in prison. RT 8086, 8088. Derrick Shields was in a different dorm and they rarely saw each other, contrary to Shields' testimony. RT 8098. When Mr. Cayton got out of prison, Mr. Greer gave him $500. RT 8101.

On the night Richard Garrett was murdered, Mr. Greer got into a fistfight with him over the way he was treating Nashitia Jones, the mother of Mr. Greer's oldest daughter. Mr. Greer did not know Garrett. "[T]he guy was towering over her all in her face . . . [S]he was scared." RT 8027, 8031, 8040. Greer told Garrett that he shouldn't be treating Nashitia like that. Garrett tried to hit Greer with a beer bottle, he blocked it, hit him, and the fistfight began. RT 8043. Mr. Greer heard two shots, Garrett dropped to the ground, he turned around and saw Derrick Washington holding a gun and Sedrick Perkins walking with a gun in his hand. As Mr. Greer ran off, he heard two more shots. RT 8045, 8049-8051.

ECF No. 1184-10 at 44-49.

**IV. Law Applicable to Motions Pursuant to 28 U.S.C. § 2255**

A federal prisoner making a collateral attack against the validity of his or her conviction or sentence must do so by way of a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255, filed in the court which imposed sentence. *United States v. Monreal*, 301 F.3d 1127, 1130 (9th Cir. 2002). Under § 2255, the federal sentencing court may grant relief if it concludes that a prisoner in custody was sentenced in violation of the Constitution or laws of the United States. *Davis v. United States*, 417 U.S. 333, 344-45 (1974); *United States v. Barron*, 172 F.3d 1153, 1157 (9th Cir. 1999). To warrant relief, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also*

*United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003) ("We hold now that *Brecht's* harmless error standard applies to habeas cases under section 2255, just as it does to those under section 2254.")  Relief is warranted only where a petitioner has shown "a fundamental defect which inherently results in a complete miscarriage of justice."  *Davis*, 417 U.S. at 346.  *See also United States v. Gianelli*, 543 F.3d 1178, 1184 (9th Cir. 2008).

Under § 2255, "a district court must grant a hearing to determine the validity of a petition brought under that section, '[u]nless the motions and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"  *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting 28 U.S.C. § 2255).  The court may deny a hearing if the movant's allegations, viewed against the record, fail to state a claim for relief or "are so palpably incredible or patently frivolous as to warrant summary dismissal."  *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996) (internal quotation marks omitted). *See also United States v. Withers*, 638 F.3d 1055, 1062-63 (9th Cir. 2011); *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003).  To warrant a hearing, therefore, the movant must make specific factual allegations which, if true, would entitle him to relief.  *Withers*, 638 F.3d at 1062; *McMullen*, 98 F.3d at 1159.  Mere conclusory assertions in a § 2255 motion are insufficient, without more, to require a hearing. *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980).

**V.  Greer's Claims**

Greer raises numerous claims in his § 2255 motion alleging that his trial and appellate counsel rendered ineffective assistance.  In the traverse, Greer describes the framework of his claims as follows:

> Was the evidence sufficient to establish beyond a reasonable doubt that Pitch Dark Family (PDF) was an "enterprise" (not merely an undefined street gang), as defined by the RICO statute and case law, and  (2) did Greer and/or Walker participate in the "affairs" of an "enterprise" through a "pattern" of racketeering activity? (3) Did appellate counsel provide ineffective assistance in violation of the Sixth Amendment by omitting a challenge to the sufficiency of the evidence on direct appeal?

ECF No. 1205 (Traverse) at 9-10.  The specific claims described in the traverse are: (1) there was insufficient evidence introduced at Greer's trial to support the racketeering charges; (2) Greer's

trial and appellate counsel rendered ineffective assistance through numerous errors; (3) the

government committed misconduct, in violation of *Brady v. Maryland* 373 U.S. 83 (1963), *Napue*

*v. Illinois*, 360 U.S. 264, 269 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972); and (4)

Greer's appellate counsel rendered ineffective assistance in failing to challenge the government's

expert opinion testimony concerning the origin of cocaine base.

On direct appeal, Greer raised the following claims: (1) the trial court's admission into

evidence of the testimony of Detective Fowler violated Fed. R. Evid. 703 (permissible bases of an

expert's opinion testimony) and Greer's Sixth Amendment right to confrontation; (2) the trial

court erred in admitting the testimony of Charles McClough regarding three conversations during

which Greer and Walker failed to deny their participation in the alleged predicate racketeering act

of the murder of Keith Roberts; (3) evidence of "other acts" was improperly admitted into

evidence at Greer's trial; (4) Special Agent French's statements about the truthfulness of Danyea

Gray's testimony to the grand jury warranted reversal of Greer's convictions under the plain error

standard; and (5) the prosecutor committed misconduct in the following particulars: (a) when

asking witnesses about the difficulty of testifying against the defendants; (b) when asking Special

Agent French about the potential consequences of alleged instances of witness intimidation; (c)

by giving personal assurances as to the veracity of the witnesses; (d) by insinuating that extra-

record material supported the witnesses' testimony; and (e) by vouching for the testimony of

Special Agent French. *United States v. Walker*, 391 F. App'x 638 (9th Cir. 2010) at **1-3.

To the extent Greer is attempting to raise in his § 2255 motion the same claims or

arguments that he raised on appeal, his claims are not cognizable. *See United States v. Redd*, 759

F.2d 699, 701 (9th Cir. 1985) (claims previously raised on appeal "cannot be the basis of a § 2255

motion."); *United States v. Currie*, 589 F.2d 993, 995 (9th Cir. 1979) ("[i]ssues disposed of on a

previous direct appeal are not reviewable in a subsequent § 2255 proceeding."). *See also Davis v.*

*United States*, 417 U.S. 333, 342 (1974) (issues determined in a previous appeal are not

cognizable in a § 2255 motion absent an intervening change in the law). Further, claims

challenging the sufficiency of the evidence are not cognizable in § 2255 motions. *See United*

*States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010) (movant's "evidence-based" claim that

"called into doubt the overall weight of the evidence against him" was not cognizable in § 2255 motion); *Barkan v. United States*, 362 F.2d 158, 160 (7th Cir. 1966) ("a collateral proceeding under section 2255 cannot be utilized in lieu of an appeal and does not give persons adjudged guilty of a crime the right to have a trial on the question of the sufficiency of the evidence or errors of law which should have been raised in a timely appeal"); *United States v. Collins*, 1999 WL 179809 (N.D. Cal. Mar. 25, 1999) (insufficiency of the evidence is not a cognizable attack under section 2255).

Similarly, claims that could have been, but were not, raised on appeal are not cognizable in § 2255 motions. *United States v. Frady*, 456 U.S. 152, 168 (1982( (a collateral challenge is not a substitute for an appeal); *Sunal v. Large*, 332 U.S. 174, 178 (1947) ("So far as convictions obtained in the federal courts are concerned, the general rule is that the writ of habeas corpus will not be allowed to do service for an appeal"); *Unites States v. Dunham*, 767 F.2d 1395, 1397 (9th Cir. 1985) ("Section 2255 is not designed to provide criminal defendants repeated opportunities to overturn their convictions on grounds which could have been raised on direct appeal"). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice," or that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted).

Greer has not demonstrated that he is "actually innocent." However, "[i]neffective assistance of counsel constitutes 'cause' for failure to raise a challenge prior to section 2255 collateral review." *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993). Thus, Greer's claims of ineffective assistance of counsel are cognizable in this § 2255 motion. After setting forth the applicable legal principles, the court will address Greer's claims of ineffective assistance of counsel below.

### 1. Legal Principles: Ineffective Assistance of Counsel

The applicable legal standards for a claim of ineffective assistance of counsel are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient

performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 562 U.S. at 106. Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (internal quotation marks and alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. A reviewing court "need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

The *Strickland* standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Counsel "must be allowed to decide what issues are to be pressed." *Id.* Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." *Id. See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.") There is, of course, no obligation to raise meritless arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. *See Miller*, 882 F.2d at 1434. In order to establish prejudice in this context, Greer must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. *Id.* at 1434 n.9.

### 2. Ineffective Assistance of Trial Counsel

#### a. Failure to Interview and Call Marcus Taplin and Eric Webster to the Stand

Greer claims that his trial counsel rendered ineffective assistance in failing to call Marcus Taplin and Eric Webster as trial witnesses. The court will address these claims in turn below.

#### i. Marcus Taplin

As set forth above, Jason Hickerson testified about his attempted murder. Among other things, he stated that a group of people, including Greer, Jason Walker, Jones, and Marcus Taplin, exited a grey vehicle and chased him before he hid in a garage. RT Dec. 7, 2005, at 104-06. After he left the garage, the same group of people, including Marcus Taplin, found and chased him again, at which point he was shot. *Id.* at 111-12. Jones was later convicted of the attempted murder of Jason Hickerson in state court after his plea of guilty. *Id.* at 47.

Greer states that FBI agents interviewed Marcus Taplin about his involvement in the attempted murder of Jason Hickerson. ECF No. 1126 at 38. Greer explains that during this interview:

> Marcus Taplin stated that he did not know anyone named Jason Hickerson. He further stated that he did not know Jason Walker/Shango Greer nor did he ever hear of a gang called "Pitch Dark Family".

*Id.*[5] Greer argues that his trial counsel should have interviewed and called Marcus Taplin as a witness to "refute" Jason Hickerson's testimony that Taplin was involved in his attempted murder. *Id.* He argues that Taplin's testimony could have provided a challenge to Hickerson's claim that Taplin was in the grey vehicle and could have resulted in "the likelihood that the jury would have believed that Petitioner Greer was not in that automobile either." *Id.* at 42. Greer further argues that Taplin's testimony "would have possibly acquitted Petitioner Greer for the Racketeering Act 2 (the attempted murder of Jason Hickerson).

In the traverse, Greer informs the court that Hickerson did not mention at the preliminary hearing, as he did at Greer's trial, that he saw Marcus Taplin jump out of a car and chase him into a garage. ECF No. 1205 at 75. He also notes that Hickerson's testimony at the preliminary hearing was inconsistent in several other respects with his trial testimony (e.g., Hickerson testified at the preliminary hearing that he found some drugs in an alley, whereas at trial he admitted he stole the drugs from a car; and he stated at the preliminary hearing that he only saw Greer and another person inside the car before he was shot but identified additional persons in the car at trial). *Id.* at 76. Greer asserts that Hickerson was "a proven and admitted liar," and that testimony from Taplin that he was not involved in Hickerson's attempted murder would have further impeached Hickerson's credibility as a witness. Specifically:

> Had Taplin testified that he did *not* know Hickerson, Greer, Walker, or anything about PDF and was *not* in a car with Greer, or Walker and others who chased and eventually shot Hickerson, Hickerson's account of the incident would have been further impeached, raising a reasonable doubt as to the presence of [Greer or Jason Walker] at the time Hickerson was shot.

*Id.* at 76-77. Greer notes that he (Greer) was the only witness allegedly involved in the pursuit and shooting of Hickerson to testify about that incident at trial. *Id.* at 76.

The government counters that any error resulting from the failure of Greer's trial counsel to call Taplin as a witness was harmless. ECF No. 1184 at 38. It notes that Greer testified at his

---

[5]  The record reflects that, while Taplin denied knowing these individuals, he later admitted he might have heard their names or "said hi or bye to them." ECF No. 1184-3 at 2. Taplin denied being present at a shooting that took place in Vallejo. *Id.*

1    trial that he had been with the group in the car that was following Hickerson on the day he was

2    shot, even though he stated that he left the group before the shooting.  RT Feb. 21, 2006, at 8009-

3    17.  It argues that Greer's testimony regarding the Hickerson shooting was not credible and that

4    testimony by Taplin that he was unaware of PDF or any of its members would have been

5    similarly incredible.  ECF No. 1184 at 39.  The government notes that the involvement of Marcus

6    Taplin in the shooting of Hickerson formed only a limited portion of the trial testimony on that

7    subject.  *Id.*  It argues that "trial counsel's choice not to call Taplin to the stand was well-within

8    the realm of an objectively reasonable strategic decision."  *Id.* at 40.

9                              **ii.  Eric Webster**

10           Greer also argues that his trial counsel rendered ineffective assistance in failing to call

11   Eric Webster as a witness at his trial.  Evidence introduced at Greer's trial reflected that Eric

12   Webster, brother of Dante Webster, supplied PDF with guns and drugs.  RT Jan. 11, 2006, at

13   5218, 5288; RT Jan. 18, 2006, at 5702, 5741, 5742; RT Dec. 15, 2005, at 96, 104-05, 121.  Eric

14   Webster was also implicated in the Keith "York" Roberts murder.  *See, e.g.,* RT March 1, 2006,

15   at 8527-36; 8539-44.  Greer claims that his trial counsel should have called Eric Webster to the

16   stand to "refute these allegations as Petitioner Greer urged his attorney to do."  ECF No. 1126 at

17   39.  He suggests that Eric Webster:

18               could have told investigators and testified at trial that he never
             supplied Petitioner Greer nor "PDF" with any drugs or guns as
19               alleged at trial.  He could have been out of state on business and
             thus proved so during the time of the conspiracy.  Or even
20               incarcerated.  He also could have been cross-examined about the
             Keith Roberts murder.  Possibly giving an negative impression
21               which would have added on to Townley's testimony.

22   *Id.* at 41.

23           The government argues that counsel's decision not to call Eric Webster as a witness was

24   consistent with the defense strategy that another gang ("Folks"), and not PDF, had committed all

25   of the crimes alleged in the indictment but had "set up" PDF to take the blame.  ECF No. 1184 at

26   40-42.  The government cites portions of the defense closing argument to support its argument

27   that a failure to call Eric Webster to the stand was consistent with the defense theory that "many

28   of the witnesses were Folks members or associates and were all trying to set up the completely

                                    33

innocent rap group, PDF, and its members." *Id.* at 41. The government argues that Eric Webster would likely not have testified consistent with this defense theory and this is why Greer's trial counsel chose not to call him as a witness. *Id.* at 42.

### iii. <u>Analysis</u>

Greer's claim that his trial counsel rendered ineffective assistance in failing to call Marcus Taplin and Eric Webster as trial witnesses should be rejected due to Greer's failure to make a sufficient showing of prejudice with respect to either witness. Without credible evidence as to what additional witnesses would have testified to at trial, a habeas petitioner cannot establish prejudice with respect to a claim of ineffective assistance of counsel for failing to call trial witnesses. *See Dows v. Wood*, 211 F.3d 480, 486-87 (2000) (no ineffective assistance of counsel for failure to call an alleged alibi witnesses where petitioner did not identify an actual witness, did not provide evidence that the witness would have testified, nor presented an affidavit from the alleged witness he claimed should have been called); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same); *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would testify); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to satisfy the prejudice prong of an ineffectiveness claim because he offered no indication of what potential witnesses would have testified to or how their testimony might have changed the outcome of the hearing).

Greer has failed to demonstrate that Marcus Taplin and Eric Webster would have testified at his trial or, even if they had, that they would have testified in the manner that Greer suggests. Although Greer proposes possible testimony that these witnesses may have given, his speculation in this regard is insufficient to demonstrate prejudice. It is also possible that Greer's trial counsel investigated the possibility of calling these two witnesses but determined that their testimony was not credible and/or would not be helpful to the defense theory. As set forth above, this court must give defense counsel the benefit of the doubt and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen,* 563 U.S. at 196.

Greer has failed to demonstrate that trial counsel's failure to call either of these witnesses fell outside the wide range of professional assistance or rendered his trial fundamentally unfair. Accordingly, he is not entitled to federal habeas relief on these two claims ineffective assistance of counsel.

### b. __Failure to Challenge the Testimony of Detective Fowler pursuant to Fed. R. Crim. P. 16(a)(1)(G)__

Fed. R. Crim. P. 16(a)(1)(G) provides as follows:

> Expert witnesses.--At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition. The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

In his next claim for relief, Greer argues that the government failed to comply with Rule 16(a)(1)(G) in that it did not adequately disclose the opinions about which prosecution expert witness Detective Fowler was going to testify or "the foundation, bases and reasons" for Fowler's opinions. ECF No. 1126 at 118-19. He claims that his trial counsel rendered ineffective assistance in failing to raise an objection to Fowler's testimony based on the government's violation of Rule 16. *Id.*

Greer states that "one of the key elements of a RICO conspiracy is the structure, organization, and management of the affairs of a racketeering enterprise, all as they relate to conducting the affairs of an enterprise through a pattern of racketeering activity." *Id.* at 120. He asserts that Detective Fowler was "called as the final witness in the government's case-in-chief to tie the case all together, providing an expert opinion that PDF was a street drug gang that controlled a section of West Vallejo where its members dealt drugs." *Id.* at 122. He argues that whether or not PDF was a RICO enterprise should have been proven with "facts," and not the opinion of Detective Fowler. *Id.* In support of this argument, Greer cites *United States v. Mejia*,

545 F.3d 179, 195 (2d Cir. 2008), in which the Second Circuit vacated the defendant's conviction for racketeering-related crimes because essential elements had been proven through opinion testimony.  He argues that his trial counsel's failure to object to the Fowler's testimony based on the government's failure to comply with Fed. R. Crim. P. 16(a)(1)(G) improperly "allowed the government to prove a RICO case through Detective Fowler's testimony."  *Id.* at 125.

Greer notes that Fowler testified he wrote a complete report and gave it to the prosecutors.  *Id.*  He states that no such report was turned over to the defense.  *Id.*  He further argues that Fowler's testimony was not admissible under the Federal Rules of Criminal Procedure and that "there can hardly be anything more prejudicial to Petitioner Greer than allowing the jury to hear evidence that is not admissible in a RICO prosecution."  *Id.* at 126.  In essence, Greer argues that Detective Fowler was not qualified to render an opinion as to whether PDF was a RICO enterprise and that his trial counsel rendered ineffective assistance in failing to challenge Fowler's testimony under Fed. R. Crim. P. 16(a)(1)(G).

Among other arguments, the government points out that Greer's trial counsel did raise an objection to Detective Fowler's testimony on the grounds that the government failed to comply with Rule 16(a)(1)(G).  The government argues that, for this reason, Greer's ineffective assistance of counsel claim lacks a factual basis and should be denied.  This court agrees.

Greer's trial counsel and counsel for Jason Walker filed a joint motion in limine entitled "Motion in Limine – Challenge to Government's Proferred Gang Expert's Qualifications."  ECF No. 497.  Therein, Greer and Walker argued that the government had failed to provide the disclosures required by Rule 16(a)(1)(G) and 18 U.S.C. § 3500 with regard to the testimony of Detective Fowler.  *Id.* at 2.  They requested an *in limine* "Daubert" hearing.[6]  *Id.* at 3.

Subsequently, trial counsel for Jason Walker and Greer filed a joint motion "for Discovery of Gang Expert's Required Disclosures."  ECF No. 531.  Therein, they detailed their attempts to

---

[6]  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the United States Supreme Court defined the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence - especially Rule 702 - [ ] assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

obtain from the government "a written summary of Det. Fowler's testimony, his opinions, the bases and reasons for those opinions, his qualifications, and a copy of all court transcripts in which Det. Fowler had testified and qualified as an expert witness in both state and federal courts." *Id.* at 3. Walker and Greer argued that the government had not "appropriately or substantively complied with Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure." *Id.* at 3-4. Their motion included a detailed list of documents sought pursuant to Rule 16(a)(1)(G). *Id.* at 4-7. The joint motion for discovery was heard on November 14, 15 and 17, 2005. During that hearing, the issue of appropriate disclosures under Rule 16(a)(1)(G) was extensively addressed. ECF Nos. 535, 538, 541; RT, November 14, 15, 17, 2005.

As described above, Greer's trial counsel filed several motions challenging the testimony of Detective Fowler based on the government's failure to comply with Fed. R. Crim. P. 16(a)(1)(G). Those motions were given a full hearing in the trial court. Greer's claim that his trial counsel failed to raise such a challenge simply lacks a factual basis and must be denied.[7]

**c.** **Failure to Challenge Perjury Committed by Uvonda Parks During the Grand Jury Stages**

This claim is discussed below, in connection with Greer's claims of ineffective assistance of appellate counsel.

_____

[7] The government also argues that some of Greer's arguments of ineffective assistance of trial counsel were raised and rejected on appeal and may not be raised again in this § 2255 motion. Greer argues in this motion that Fowler's testimony as a gang expert was inadequate to demonstrate that PDF was a RICO enterprise because it was based on his "opinion" and not on facts, and that the testimony of other trial witnesses failed to make the required showing. Greer made similar arguments on direct appeal, claiming that: (1) the trial court erred in admitting Detective Fowler's testimony on "street intelligence" and admissions by Greer's co-defendants, because whether PDF was a RICO enterprise was a factual matter that did not require "expert interpretation;" (2) an expert witness cannot be used as a "conduit" for introducing otherwise inadmissible hearsay evidence; and (3) the opinion testimony of Detective Fowler was not sufficient, standing alone, to establish that PDF was a RICO enterprise. ECF No. 1184-10 at 72-75. The Ninth Circuit concluded that Detective Fowler's testimony was "both reliable and relevant and thus admissible" under Federal Rule of Evidence 702." *Walker,* 2010 WL 3069915, at *1. Thus, to the extent that Greer is making the same arguments in this § 2255 motion, or raising the same claims that he made on appeal, they are not cognizable. *See Redd,* 759 F.2d at 701 (claims previously raised on appeal "cannot be the basis of a § 2255 motion). The question whether Detective Fowler was qualified to testify at Greer's trial was extensively litigated in the trial court and on appeal and may not be re-litigated in this § 2255 motion.

### d. **Misinforming Greer about his Maximum Penalty**

Greer was sentenced to life in prison. ECF No. 775. He claims that his trial counsel "misinformed" him about the maximum penalty he faced. ECF No. 1126 at 139. He claims that: (1) his trial counsel told him that the maximum sentence he could receive was "20-years for a violation of § 1962(d);" (2) prior to trial, counsel told Greer that the government had offered him a 13-year sentence to plead guilty to the RICO violations; (3) his trial counsel failed to explain the sentencing guidelines to him; (4) trial counsel failed to discuss with him "the advisability of whether to accept or reject the government's plea offer due to the fact that he could be enhanced for predicate acts pursuant to the Sentencing Guidelines;" and (5) counsel did not convey to him "his opinion as to the wisdom of the plea nor did he give any suggestions as to how to deal with the government's plea offer." *Id.* at 139-40; *see also* ECF No. 1141 at 6. Greer states that he did not think he could receive a mandatory life sentence for a RICO violation and that "if properly advised by counsel, he would have accepted the [plea offer of 13 years] instead of proceeding to trial." ECF No. 1126 at 140. In essence, Greer claims that his trial counsel failed to advise him "of the correct maximum penalty, a mandatory life sentence." ECF No. 1205 at 79. He requests that "this issue be bifurcated and addressed only if the Court finds the evidence was sufficient to support the RICO convictions beyond a reasonable doubt." *Id.* at 81.

The government counters that Greer's representations about the advice he received from his trial counsel are not supported by the record facts. First, the government provides evidence that Peter Kmeto, Greer's trial counsel, was aware of the maximum sentence that Greer faced. In a letter sent to the government prosecutors more than a year prior to Greer's trial, counsel stated as follows:

> It bears noting that if the government decides against seeking the death penalty for Mr. Greer, the offenses charged in Counts I and II of the Indictment, if proven, subject our client to a sentence of life imprisonment. See 18 U.S.C. § 1963(a) which provides that a violation of any section of 1962 shall be punished by not more than twenty years or for life if the violation is based on racketeering activity for which the maximum penalty includes life imprisonment. In the instant case the racketeering acts alleged in Counts I and II are based, in part on allegation [sic] for which the maximum penalty includes life imprisonment.

1   ECF No. 1184-4 at 4.

2       The government also provides evidence that Greer was informed from other sources that

3 he could receive a maximum sentence of life in prison. Specifically, during his initial appearance

4 and arraignment, the trial court informed Greer that counts one and two of the indictment carried

5 a "maximum potential penalty of life," and that count four carried a potential sentence of "the

6 death penalty or life in prison." ECF No. 1180 at 3. At a subsequent court hearing at which

7 Greer was present, Mr. Kmeto stated that Greer and Jason Walker were "facing life sentences."

8 RT Feb. 7, 2006, at 7206. The government argues that "one can fairly infer that [Greer's and

9 Walker's] very competent attorneys had in fact previously advised them of the maximum

10 penalty." ECF No. 1184 at 51. The government also provides evidence that the trial court

11 carefully selected counsel for defendants in this case based on their "experience and

12 qualifications." *See* RT Mar. 10, 2003, at 4. The government also argues that this court "need

13 not abandon its practical experience because [Greer] makes highly dubious claims" about the

14 advice he received from his trial counsel about his possible sentence. The government requests

15 that this court examine Greer's claim in light of the trial record as a whole and the experience and

16 credentials of Greer's trial counsel. ECF No. 1184 at 53.

17       The *Strickland* standards apply to claims of ineffective assistance of counsel involving

18 counsel's advice offered during the plea bargain process. *Missouri v. Frye*, ___ U.S. ___, 132

19 S.Ct. 1399 (2012); *Lafler v. Cooper*, ___ U.S. ___, 132 S.Ct. 1376 (2012); *Padilla v. Kentucky*,

20 559 U.S. 356 (2009); *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Nunes v. Mueller*, 350 F.3d 1045,

21 1052 (9th Cir. 2003). Trial counsel must give the defendant sufficient information regarding a

22 plea offer to enable him to make an intelligent decision. *Id.* at 881. "[W]here the issue is whether

23 to advise the client to plead or not 'the attorney has the duty to advise the defendant of the

24 available options and possible consequences' and failure to do so constitutes ineffective

25 assistance of counsel." *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting

26 *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir. 1981)). The relevant question is not whether

27 "counsel's advice [was] right or wrong, but . . . whether that advice was within the range of

28 competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759,

771 (1970) (holding that all defendants facing felony charges are entitled to the effective assistance of competent counsel).

To show prejudice in the context of plea offers, "a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384. In cases where trial counsel's defective advice caused the defendant to reject a plea offer and proceed to trial, prejudice is demonstrated where "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 1385.

Greer's unsupported and self-serving statements (that he relied on inaccurate advice from his counsel when deciding to proceed to trial) fail to establish either deficient performance or prejudice. *See, e.g., Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (ineffective assistance of counsel claim denied where, aside from his self-serving statement, which was contrary to other evidence in the record, there was no evidence to support his claim); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (noting that there was no evidence in the record to support petitioner's ineffective assistance of counsel claim, "other than from Dows's self-serving affidavit"); *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991) (defendant's self-serving statement, under oath, that his trial counsel refused to let him testify insufficient, without more, to support his claim of a denial of his right to testify); *Elizey v. United States*, 210 F. Supp. 2d 1046, 1051 (C.D. Ill. 2002) (petitioner's claim that his trial counsel failed to advised him to accept a proffered plea agreement not sufficiently supported where only evidence was petitioner's "own self-serving affidavit and record facts contradicted petitioner's affidavit."). There is no evidence in the record before the court, aside from Greer's unsupported allegations, that Greer's trial counsel guaranteed a certain sentence, that he failed to advise Greer of his options, that he failed to explain the sentencing guidelines, or that he completely failed to discuss the government's plea offer with him. On the other hand, the record provides abundant evidence that trial counsel and

Greer were both aware of the fact that Greer could receive a life sentence if he proceeded to trial. The court also observed that the identical nature of the claims being made by Walker and Greer about the advice given by their separate trial counsel casts doubt on the veracity of their claims.

After a review of the record in this case, this court concludes that Greer has failed to show that trial counsel's advice at the plea bargain stage was outside the range of competence demanded of attorneys in criminal cases. Accordingly, Greer is not entitled to relief on this claim.

### 3. Ineffective Assistance of Appellate Counsel

#### a. Counsel's Failure to Challenge Perjury Committed during Grand Jury Proceedings by Derrick Washington, Jason Hickerson, Uvonda Parks, and Dante Webster

Greer contends that the grand jury indictment was based on false and material testimony given by Derrick Washington , Jason Hickerson, Uvonda Parks, and Dante Webster. ECF No. 1205 at 16; ECF No. 1126 at 4-20, 21-31, 127-139. He claims his appellate counsel rendered ineffective assistance in failing to challenge the indictment on this basis. ECF No. 1126 at 32. The court will address these claims in turn below.

#### i. Derrick Washington

On December 6, 2000, Derrick Washington testified before the grand jury. He stated that Greer was involved in the murder of Larry Rude. ECF No. 370 (sealed) at 34-36; ECF No. 1126 at 5-7. Washington also testified about the history, structure, membership, and activities of PDF, including shootings and sales of illegal drugs. ECF No. 370 at 25-50. Washington's testimony about Larry Rude's murder was false.

On December 18, 2002, after the grand jury was disbanded, a new grand jury met to read transcripts of the testimony of witnesses who had testified before the December 6, 2000 grand jury and to hear additional testimony in this case. ECF No. 402 (sealed), at 2. One of the transcripts the new grand jury reviewed was Derrick Washington's previous testimony about Rude's murder. *Id*. After the grand jury had reviewed the transcript, the prosecutor informed the grand jurors that:

With respect to Derrick Washington . . . we also had sort of had information come in that raised some questions about what happened the night of the Larry Rude shooting. And without us specifically telling him we knew, he came clean with us and acknowledged that he had, he had lied. He had not been truthful about the Larry Rude shooting in that it was not Shango [Greer] who was the second shooter with Lou, that it was him . . .

*Id.* at 21.[8] The prosecutor also informed the grand jurors that Washington had "some severe learning disabilities" and "is not a really intelligent person;" that he "felt very badly" about the murder and wished he could apologize to Rude; that he was afraid of Greer because he was "the most frightening of the people in the group;" that he had "seen and heard about [Greer] doing really bad things" and for that reason Washington decided to implicate Greer; and that "it's the only thing like this he's [Washington] ever been involved in." *Id.* at 22-23.

After making these statements, the prosecutor asked the grand jurors if they could believe the rest of Washington's testimony to the previous grand jury after hearing that he had lied about the Larry Rude murder. *Id.* at 23. One juror responded that he could believe the rest of Washington's testimony, notwithstanding his perjury about the Larry Rude murder. Several other jurors responded that they could not believe any of Washington's testimony after hearing about the perjury. *Id.* at 23-24, 27. Approximately one month later, the second grand jury returned the indictment against Greer and Jason Keith Walker.

Greer argues that Washington's testimony was crucial to the government's case that the PDF was a racketeering enterprise. ECF No. 1126 at 8. He argues that Washington "provided essential testimony to [sic] PDF shooting people, selling dope having gang signs and tattoos." *Id.* He argues that "Derrick Washington's 'perjurious' testimony gave the crucial link the Grand Jury needed to indict pursuant to RICO" and that Washington's perjurious testimony was directly relevant to the RICO allegations and whether PDF was an "enterprise" under that statute. *Id.* at 8, 16. Greer argues that without Washington's false testimony, "the Grand Jury had no evidence

---

[8] Washington testified at Greer's trial that he, and not Greer, shot and killed Rude, but that he falsely told the police that Greer was involved in this shooting. RT Jan. 18, 2006, at 5710-11. He explained that he made the initial false report because he was "scared" and didn't want to go to jail. *Id.* at 5711. The murder of Larry Rude was not a predicate act in this case, nor was it referenced in the indictment.

that PDF was an ongoing organization, nor that they functioned as a continuing unit," and that without Washington's testimony "the government did not provide the Grand Jury any ascertainable structure distinct from the alleged racketeering activity itself." *Id.* at 8, 19. Greer notes that Washington provided testimony with respect to shootings by PDF members, selling narcotics, and using gang signs and tattoos. *Id.* He states that Washington's grand jury testimony provided the history of PDF and "the beginning of a so called organization titled "PDF." *Id.*

Greer also argues that Washington's testimony to the December 6, 2000 grand jury that Greer was a shooter in the Larry Rude murder was "'material' to the Grand Jury returning an indictment for the RICO charges." *Id.* He further argues that Washington's testimony that Greer shot Rude because PDF member Lew was also shooting him provided a link between Greer himself and the activities of PDF. *Id.* at 8-9. Greer notes that although the prosecutor specifically corrected Washington's testimony about who was responsible for Rude's murder, she did not ask Washington if he lied about other testimony, such as the shooting being connected to PDF activities. *Id.* at 9. Greer complains that the prosecutor "did not return Washington to the Grand Jury to correct his perjury making 'PDF' an organization with a chain of command and structure." *Id.* at 10. Instead, according to Greer, the prosecutor "vouched" for Washington and tried to rehabilitate Washington's credibility. *Id.*

Greer notes that Washington was implicated in the Richard Garrett shooting as well. *Id.* at 12-13. He argues that because the jury foreman stated he would not believe "anything Washington had to say" after learning that Washington had lied to the first grand jury, the veracity of Washington's testimony on other subjects, such as testimony about the Garrett and Roberts murders, was also suspect. *Id.* at 13. He argues that the prosecutor "tried to clean up [Washington's] testimony." *Id.*

"When a duly constituted grand jury returns an indictment valid on its face, no independent inquiry may be made to determine the kind of evidence considered by the grand jury in making its decision." *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974) (citing *Costello v. United States*, 350 U.S. 359 (1956). However, the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the

43

government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel - and, if the perjury may be material, also the grand jury - in order that appropriate action may be taken. *Basurto*, 497 F.2d at 785-86. The prosecution has a duty "not to permit a person to stand trial when he knows that perjury permeates the indictment." *Id.* at 785. On the other hand, a prosecutor does not have a duty to disclose substantial exculpatory evidence to a grand jury, even if that evidence impeaches the credibility of grand jury witnesses. *United States v. Haynes*, 216 F.3d 789, 298 (9th Cir. 2000).

In this case, the government argues that any error in presenting the testimony of Washington to the grand jury was cured by a guilty verdict from the trial (petit) jury. ECF No. 1184 at 55. *See United States v. Navarro*, 608 F.3d 529, 536 (9th Cir. 2010) ("Even if error in the grand jury proceedings . . . was brought to the attention of the district court prior to trial, where the motion was denied and a guilty verdict was returned, the error is rendered harmless by the verdict); *United States v. Mechanik*, 475 U.S. 66, 70 (1986) ("the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt").

Greer counters that the prosecutor improperly attempted to rehabilitate Washington before the grand jurors and, in effect, recruited them to collaborate in neutralizing any negative effect from Washington's perjury. ECF No. 1205 at 85-89. Greer argues that the prosecutor's conduct "resulted in a grand jury which was neither neutral nor detached, but actively engaged in ensuring the conviction of [Greer and Jason Walker] before they had determined whether they should be indicted." *Id.* at 85. He contends that the prosecutor essentially vouched for the credibility of Washington, notwithstanding his perjury, through her own unsworn statements about his motives and his fear of Greer. Greer further argues, "this was not a mere 'defect' in the process but rather intentional conduct meant to steer the grand jury not only to an indictment by glossing over

Washington's admitted perjury and murder of Lawrence Rude but to enlist the grand jury in convicting petitioners." *Id.*

In support of this argument, Greer cites *United States v. DeRosa*, 783 F.2d 1401, 1404 (9th Cir. 1986), which held that "the prosecutor may not circumvent the constitutional safeguard of a grand jury by overreaching conduct that impinges on the grand jury's autonomy and interferes with its exercise of unbiased judgment." *Id.* at 1404. Greer argues the prosecutor's attempts to explain to the grand jurors why Washington lied before the previous grand jury violates this rule.

Greer also criticizes the following exchanges between the prosecutor and the grand jury, which occurred after the jurors had been advised about Washington's perjury but before they had decided whether to issue an indictment:

> GRAND JUROR: I have another question. So if, if you just cut him (Washington) loose, it probably doesn't come into it at all. Yeah, I guess I, if I'm the family of the victim here, whether this guy gets off scot-free or whatever, I'd at least like to have it stated that I'd like to hear for myself that guy shot my whoever, and killed my – you know what I mean? So I guess –
>
> MS. RAFKIN (the prosecutor): Okay. But that's not going to come out at the trial.

ECF No. 402 (sealed) at 31.

> GRAND JUROR: Are you going to be the attorney who's going to be there trying to sell the jury on how –
>
> MS. RAFKIN: Oh, yeah. Yeah. Do you think I could get anybody else to take this for me?
>
> (Laughter.)
>
> * * *
>
> GRAND JUROR: You have to really establish why he changed, you know –
>
> MS. RAFKIN: Yeah. So, but I still want to know, even if –
>
> GRAND JUROR: Well, because his own neck was on the line.
>
> MS. RAFKIN: I, my sense is even if I give you all of that, there are some of you that that's not going to make a difference. And I want to know that. There are –

45

\* \* \*

So, the question is, all right, if you reject him, and a defense attorney came at you that this tainted the whole case, knowing what else you know, would you go all right, I'm going to follow him to the extent that I think this guy's full of shit and I'm not going to believe anything he says, but that doesn't mean I'm going to throw out the rest of the government's case.

You know, if you threw, if you disregarded his testimony, would that change the way you viewed the rest of the evidence you saw, knowing what you've known before?

GRAND JUROR: And you've still heard it. You've still heard it.

MS. RAFKIN: Yes.

*Id.* at 32-34.

GRAND JUROR: No, I, I'd leave him in.

GRAND JUROR: I would, too.

GRAND JUROR: I would, too.

GRAND JUROR: I've been in three, three jury trials all the way through, and your, your concerns are very valid, and somebody may just pick it up and say this doesn't belong at all, but the, the majority of the people will say take the parts that they believe and take the parts that they don't believe, and then there'll be a big argument. And – and, however it sorts out is – but I would fear more leaving him out and not having that additional information myself. That's my feeling.

GRAND JUROR: And if you handle it right, you'll, you'll have sympathy from the jury for him. If he was one summer and he's extraordinarily sorry about it.

GRAND JUROR: I'd stick him in the middle of the mix.

(Laughter.)

*Id.* at 36.

GRAND JUROR: But can you use him in the, in the trial, then? I mean –

MS. RAFKIN: Oh yeah. That'll be, that'll be a year or two down the road . . .

*Id.* at 37-38.

46

> GRAND JUROR: . . . if you had an expert with Washington to explain that, would that help?
>
> MS. RAFKIN: It may. And it certainly is something that I, you know, you run, you run the – I would, I would want to think everything through, is a jury going to think it's worse and that it's more – does it draw more attention to it by putting an expert . . . I definitively would think about. And some of it would probably depend on what – because it would be in rebuttal, or later in the case. I would see what happened with the cross examination, and how well he came off.

*Id.* at 41-42.

Greer argues that the prosecutor's actions in essentially engaging the grand jurors in strategy sessions "placed in jeopardy 'the integrity of the criminal justice system,' denying [Greer and Jason Walker] their right to have the indictment tested by its independent judgment." ECF No. 1205 at 89. Greer argues that dismissal of the indictment was warranted by the prosecutor's misconduct and that appellate counsel's failure to raise this issue on appeal constituted ineffective assistance, in violation of the Sixth Amendment. *Id.*[9]

Greer filed a motion in the trial court to dismiss the indictment on the grounds of abuse of the grand jury and prosecutorial misconduct. Therein, he raised all of the arguments that he raises in the § 2255 motion before this court. ECF No. 195. The trial judge denied the motion to dismiss after hearing extensive argument from the parties. He ruled as follows:

> With respect to the perjury of Derrick Washington and the comments of Ms. Rafkin that accompanied an apparent explanation of his statements or his testimony, perjured testimony, Ms. Rafkin did say to the Grand Jury that he, Washington, came clean with us and acknowledged that had lied; he had not been truthful about the Larry Rude shooting and it was not Shango who was the second shooter with Lou. It was him.
>
> I think that admission, even though accompanied by what Mr. Lapham [attorney for the United States] said, certain unsworn statements by the prosecutor, is not good. That would be at least not good, Mr. Lapham. I'm not here to approve Ms. Rafkin's conduct in this case, but I am here to impose what I think is a very – I think [defense counsel] would agree as would all the lawyers in this case, this is a very difficult and high standard I have by exercising my supervisorial powers to set aside an Indictment.

---

[9] The government informs the court that it "does not endorse" the practice of having a prosecutor request the grand jurors' perspective on trial strategy. ECF No. 1184 at 58 n.25. However, it argues that the prosecutor's actions in this case were harmless.

The standard has been described in several places, but the Ninth Circuit, *Busher*[10] states: "A defendant challenging and [sic] Indictment carries a heavy burden. He must demonstrate that the prosecutor engaged in flagrant misconduct that deceived the Grand Jury or that significantly impaired its ability to exercise independent judgment."

I don't think that standard has been met here. The prosecutor did inform the Grand Jury of Washington's perjury. In fact, the Rude shooting was not part of the Indictment and I would find that it is not material to the Indictment, that perjurious testimony, because it related to the Rude shooting.

Obviously, with respect to Washington and his credibility, the government is not obligated to impeach witnesses appearing before the Grand Jury. I just don't feel that the facts in this case meet the standard and warrant dismissal of the Indictment, despite the conduct of Ms. Rafkin.

Reporter's Transcript (RT), Change of Plea for Defendant Gonzales; Motions Hearing, September 19, 2005, at 23-24.

In light of the record before the court, Greer has failed to demonstrate either deficient performance or prejudice with respect to this claim of ineffective assistance of appellate counsel. As the trial judge observed, Washington's false testimony involved only the murder of Rude; there is no evidence he testified falsely about the structure and activities of PDF. Although petitioner argues Washington's false testimony about the Rude murder permeated his grand jury testimony as a whole, there is no evidence of that in the court record. In any event, the jury found Greer guilty of the racketeering charges after hearing all of the evidence, including Washington's testimony. This rendered any error in the grand jury proceedings harmless. *Mechanik*, 475 U.S. at 70. Further, Washington's perjury was not material to this case because the Rude murder was not alleged in the indictment. *Cf. Basurto*, 497 F.2d at 785 ("the perjury before the grand jury was material"). This court also notes that, unlike in *Basurto*, the grand jurors here knew about Washington's perjury before the indictment was issued, leaving them free to exercise independent judgment while in possession of the relevant facts regarding Washington's credibility.

Given the high standard to prevail on a motion to set aside an indictment, there is no reasonable probability a claim of prosecutorial misconduct would have prevailed on appeal under

---

[10] *United States v. Busher*, 817 F.2d 1409 (9th Cir. 1987).

the circumstances of this case. *See United States v. Trass*, 644 F.2d 791, 796 (9th Cir. 1981)

("(d)ismissal of an indictment is required only in flagrant cases in which the grand jury has been

overreached or deceived in some significant way") (citations omitted). Appellate counsel's

decision not to include this claim in Greer's direct appeal, but instead to focus on claims that

counsel believed had more merit was "within the range of competence demanded of attorneys in

criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). Accordingly, Greer is not

entitled to relief on this claim of ineffective assistance of appellate counsel.[11]

### ii. <u>Jason Hickerson</u>

Greer's next claim is that his trial counsel rendered ineffective assistance "by not

challenging the knowingly committed perjury by Jason Hickerson during the Grand Jury

proceedings." ECF No. 1126 at 21. He argues that "such misconduct should be punished through

the supervisory powers of this Court by ordering dismissal of the indictment in this case." *Id.* at

28. In the traverse, Greer argues that none of Hickerson's testimony (presumably, before the

grand jury and at trial) "can support any RICO conviction in this case beyond a reasonable

doubt." ECF No. 1205 at 20.

The background to this claim is the following. Jason Hickerson testified at the

preliminary hearing about his attempted murder. He also testified about these matters before the

grand jury in this case and during Greer's trial. At the preliminary hearing, Hickerson testified

that Greer was involved in his attempted murder, but he did not implicate Jason Walker.

Hickerson testified that prior to the time of his attempted murder, he broke into a

Chevrolet in order to steal a stereo and found two ounces of crack cocaine, an Uzi submachine

gun, and a sawed-off shotgun, which he took from the vehicle. ECF No. 1126-1 at 21-22. At the

preliminary hearing, Hickerson testified that after he took these items, several people in a car,

including Greer and Eric Jones, shot him. *Id.* at 25-31. However, before the grand jury and at

Greer's trial, Hickerson identified several other people as being in the car as well, including Jason

---

[11] Any direct claim of prosecutorial misconduct in connection with the testimony of
Derrick Washington is not cognizable in this § 2255 motion because it was or could have been
raised on direct appeal. *Sunal*, 332 U.S. at 178; *Frady*, 456 U.S. at 168.

49

Walker. ECF No. 1126 at 27. Greer also informs the court that Hickerson testified at the preliminary hearing that he found the drugs in some bushes in an alley, but at Greer's trial he testified that he stole the drugs from the Chevrolet. *Id.* at 35; ECF No. 1205 at 20.[12] Greer notes that Hickerson did not testify at the preliminary hearing that Jason Walker was involved in his shooting. ECF No. 1126 at 27-28.

Greer contends that the government was aware prior to his trial that Hickerson had committed perjury because "Jason Hickerson had testified during state proceedings that Eric Jones and Shango Greer were the only individuals inside of the Honda." *Id.* at 28. He argues that the prosecutor "knew along [sic] that Jason Hickerson had testified to differing events during the state preliminary hearing in 1994." *Id.* at 30. He argues that "to knowingly submit perjured testimony to the Grand Jury in this case" violated his right to due process. *Id.* In his § 2255 motion, Greer claims that his appellate counsel rendered ineffective assistance in "not challenging the knowingly committed perjury by Jason Hickerson." *Id.*

Greer argues that he suffered prejudice from his appellate counsel's failure to raise this issue on appeal because Hickerson's trial testimony was essential to Racketeering Act Two (the attempted murder of Hickerson). *Id.* at 31. Greer argues that "had appellate counsel raised the *Basurto* line of cases, there is a likelihood that Petitioner Greer's indictment would have been dismissed for perjury at the grand jury." *Id.* at 32. He also argues that Hickerson's testimony about the attempted murder helped to establish that PDF was a criminal enterprise whose members engaged in acts of violence. *Id.* He contends that had his appellate counsel challenged Hickerson's testimony, "the government would not have had the necessary two Racketeering Acts that are needed for a RICO offense." *Id.* In the traverse, Greer argues that "none of Hickerson's impeached, untruthful, unreliable, unbelievable testimony can support any RICO conviction in this case beyond a reasonable doubt." ECF No. 1205 at 20.

/////

/////

---

[12] At Greer's trial, Hickerson testified he originally stated he found the drugs in the bushes because he "didn't want to get a burglary charge." RT Dec. 7, 2005, at 48.

The government counters that the testimony of Hickerson was "only arguably inconsistent, not perjured," and that the government had no duty to impeach his credibility before the grand jury. ECF No. 1184 at 60. The government also argues that Greer's appellate counsel acted reasonably in failing to challenge Greer's conviction on this ground, noting that the trial jury later found Greer guilty of the charges beyond a reasonable doubt. *Id.* at 60-61. The government argues that counsel's decision not to raise this issue "demonstrates a valid, strategic choice to refrain from raising a weak issue on appeal." *Id.* at 61.

The government also argues that there is no evidence Hickerson's testimony at Greer's trial was false. *Id.* The government explains that Hickerson omitted Walker's name during his 1994 preliminary hearing testimony because he was afraid of Walker, who was in the courtroom during the testimony, "staring Hickerson down." *Id.* at 62. *See* RT, Dec. 7, 2005, at 47-48; RT Dec. 12, 2005, at 9-11. Hickerson testified he did not mention Walker's involvement in the crime because he was afraid of retaliation from Walker. RT. Dec. 12, 2005, at 10-12. The government also notes that defense counsel raised the inconsistencies between Hickerson's preliminary hearing testimony and his trial testimony at trial when he cross-examined Hickerson. *See* RT Dec. 7, 8, 12, 2005.

The government provides evidence that on January 15, 2003, shortly before the indictment was presented to the grand jury, FBI agents interviewed Hickerson about the differences between his 1994 preliminary hearing testimony and his 2001 grand jury statements. Hickerson stated that he had decided not to implicate Walker in his attempted murder at the preliminary hearing because he was concerned for his safety after observing Walker making threatening gestures during his preliminary hearing testimony. ECF No. 1184-6. The government argues, "[t]hus having information that Hickerson's grand jury testimony was the accurate version of events, there was no misconduct in presenting the indictment to the grand jury." ECF No. 1184 at 63.

Greer has failed to substantiate his claim that the prosecutor in this case knew that Hickerson's testimony in any of the three tribunals was "perjured." As noted by the government, the fact that a witness testifies inconsistently does not support a claim that the prosecutor committed misconduct in presenting his testimony, without evidence that the prosecutor knew, or

51

shown have known that the testimony was false. *See Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir. 2005) ("Allen asserts no evidence, even assuming that Kenneth's trial testimony was false, that the State 'knew or should have known' that it was false"); *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) ("The fact that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false"); *United State v. Sutherland*, 656 F.2d 1181, 1203 (5 Cir. 1981) (insufficient evidence that prosecution knew witness' testimony was false where it was inconsistent with her grand jury testimony, where the grand jury testimony was available to defendants and formed the basis of cross-examination as to the prior inconsistent statements).

In this case, the defense knew about the inconsistencies in Hickerson's testimony, and those inconsistencies were explored during counsel's cross-examination of Hickerson. RT Dec. 7, 2005, Dec. 8, 2005. Indeed, Hickerson testified that he lied at the preliminary hearing, but he explained that he did so because he was afraid of Jason Walker, who was sitting in the courtroom and staring at him during his testimony. RT Dec. 7, 2005, at 47-48; Dec. 12, 2005, at 9-11. Greer's failure to challenge Hickerson's testimony on appeal constitutes a waiver of the claim in this § 2255 motion. *Frady*, 456 U.S. at 168, *Sunal*, 332 U.S. at 178.

The court also notes that there is no evidence the prosecutor knew Hickerson's testimony was false in any material respect. In this regard, Hickerson testified consistently at all three venues that Greer was involved in his shooting. As in the claim above, appellate counsel's decision not to include this ineffective assistance claim in Greer's direct appeal, but instead to focus on claims that counsel believed were more meritorious, was "within the range of competence demanded of attorneys in criminal cases." *McMann*, 397 U.S. at 771. Accordingly, Greer is not entitled to federal habeas relief on this claim.

### iii. **Uvonda Parks**

Greer also claims that his trial and appellate counsel provided ineffective assistance in failing to challenge "Uvonda Parks perjury during the grand jury stages." ECF No. 1126 at 127. At set forth above, Parks testified that she saw Charles White shoot Devin Russell with a sawed-off shotgun. She had previously falsely told police that a non-existent man named "Tray"

participated in the shooting. Parks testified at trial that she "made Tray's name up." RT Jan. 24, 2006, at 6914. She also refused to participate in the photographic lineup process. *Id.* at 6225.

Greer challenges the following portions of Parks' testimony, both before the grand jury and at Greer's trial:

- Parks testified before the grand jury that she knew "Shady and E and Oscar and Nando" because they "stayed around [her] building," she "knew what they did," and Shady "liked" her. ECF No. 1126, at 128-29; ECF No. 1126-1 at 62. However, at trial, Parks testified that while she sold heroin and cocaine to Shady (Charles), she did not know him "as a friend" and did not "consider him a . . . knowing him," but they did business together. RT Jan. 24, 2006, at 6187. Greer argues that Parks' testimony before the grand jury that she knew Shady was "perjury" that "the government was aware of." ECF No. 1126 at 130.

- At Greer's trial Parks testified that before Devin Russell was shot she and a group of people were walking down Sonoma Boulevard and encountered a person named Smooth on the street. They spoke to Smooth briefly and then moved on, leaving Smooth behind. RT Jan. 24, 2006, at 6195. However, Parks testified a short time later that Smooth was standing against the wall at the time of the shooting, thus implying that the group did not leave Smooth behind, as she had earlier testified. *Id.* at 6206.

- During the grand jury proceedings on June 12, 2002, Parks stated that Nando kicked the shooting victim, but at trial she stated that three other men kicked the victim; she did not mention Nando. ECF No. 1126-1 at 59; RT Jan. 24, 2006, at 6209.

- Parks told the grand jury on June 12, 2002, that after the shooting Oscar said "Everybody get lost" or "everybody get out," but at Greer's trial she testified that Shady made this statement. ECF No. 1126-1 at 60; RT Jan. 24, 2006, at 6210.

- Parks told the grand jury that "Darnell," whose nickname was "Boo," told her about the Devin Russell murder and that she did not get this information from Charles McClough. However at trial, she testified that "Boo" was actually Charles McClough. ECF No. 1126-1 at 56-58, 208.

/////

- Parks testified at trial that she saw Oscar Gonzales driving a car in Vallejo with a shotgun in the back seat "days after" the murder of Devin Russell. RT Feb. 1, 2006, at 7008. When confronted with the fact that Gonzales was taken into custody on the date of the Russell shooting and could not have been driving a van in Vallejo on that date, Parks stated that she had apparently "picked the wrong name of who was there." *Id.* at 7008-09.

Greer argues that the "totality" of the lies told by Parks "demonstrate the complete unreliability and unbelievability of her testimony." ECF No. 1205 at 21. Greer points to evidence that Parks could not identify a photograph of Charles White, even though she testified before the grand jury about his involvement in the Russell murder. *Id.* at 21-26. Greer claims that Parks perjured herself before the grand jury by misleading the jurors about who gave her the names of the alleged participants in the Russell murder. *Id.* at 26. He argues that Parks, "in all likelihood," did not witness the Russell homicide, did not know the participants in that homicide, and was only repeating information she was given by Charles McClough. *Id.* at 27. Greer argues that Parks' testimony was prejudicial because: (1) she testified about a murder committed by the PDF in retaliation for Russell testifying against Elliot Cole, an alleged PDF member, and therefore provided a link between the Russell murder and the entity PDF; (2) she was "the only witness to testify that she sold PDF members 'large quantities' of drugs that were not for personal use;" and (3) she testified that Russell was selling drugs for PDF members. In essence, Greer argues that "the government used [Parks'] testimony to establish PDF as a criminal enterprise." *Id.* at 28.

The government argues that Greer defaulted this claim of ineffective assistance of trial counsel by failing to raise it on appeal. ECF No. 1184 at 46. This court agrees. As set forth above, claims that could have been, but were not, raised on appeal are not cognizable in a § 2255 motion. *Sunal*, 332 U.S. at 178. Greer concedes that his trial counsel became aware of Parks' "perjury" at the end of her trial testimony. ECF No. 1205 at 27. Accordingly, a challenge to Uvonda Parks' grand jury testimony could have been raised on appeal. Because it was not, the claim is waived.

The government also argues that, in any event, Greer's trial counsel did challenge Uvonda Parks' grand jury testimony on the ground that it was perjured. ECF No. 1184 at 63. The government notes that trial counsel cross-examined Parks on many of the same topics now challenged by Greer in the instant § 2255 motion. *Id.* at 48. *See also* RT Feb. 1, 2006, at 6915-17, 6920-21, 6928-30. Greer concedes that his trial counsel challenged Parks' testimony, arguing that "time and time again her stories changed." ECF No. 1205 at 27. Based on the foregoing, Greer has failed to demonstrate either deficient performance or prejudice with respect to his claim that his trial counsel rendered ineffective assistance in failing to challenge the inconsistencies in Uvonda Parks' testimony.

Greer has also failed to show that any claim of ineffective assistance of counsel on this basis would have prevailed on appeal. Accordingly, he is not entitled to federal habeas relief on his claim that his appellate counsel rendered ineffective assistance in failing to raise a claim of ineffective assistance of trial counsel for failing to challenge perjury by Uvonda Parks.

### iv. **Dante Webster**

As described above, Dante Webster testified about an incident at Nations Burgers where PDF member Eric Jones ("EJ Rabbit") was shot after he confronted an Oakland drug dealer. Greer contends that Webster's testimony in this regard was contradicted by the testimony of Dina Gutierrez, another trial witness, who saw Webster himself shoot a man running out of Nations Burgers. ECF No. 1205 at 28. *See* RT March 2, 2006, at 8897-8901. Greer notes that Vallejo Police later went to Webster's home and confiscated a handgun which was the same caliber as the gun used to shoot Jones. RT Dec. 15, 2005 (afternoon session), at 201. Webster denied shooting Eric Jones. *Id.* at 204.

Webster testified he did not mention PDF in his interviews with Vallejo police after the shooting at Nations Burgers. *Id.* at 110. He didn't mention it because "the whole situation didn't have anything to do with me." *Id.* He stated that the first time he mentioned PDF to the police was after he was arrested for possession of cocaine. *Id.* at 165. He brought it up then because that was the first time he was asked about PDF. *Id.* at 165-66. As noted above, Webster testified

/////

in Greer's case in order to obtain sentencing leniency in connection with his own drug case.  *Id.* at 111-12.

Greer claims that his appellate counsel rendered ineffective assistance because he "failed to challenge the perjury in front of the Grand Jury pursuant to the *Basurto* line of cases."  ECF No. 1126 at 30.  He argues that the above facts demonstrate that "Webster's testimony was completely tainted with bias and unreliability and could not support any RICO conviction beyond a reasonable doubt."  ECF No. 1205 at 29.

Greer has failed to demonstrate prejudice with respect to this claim.  Because Greer was found guilty after a trial, any error in the grand jury proceeding with respect to Webster's testimony was harmless beyond a reasonable doubt.  In addition, Greer has failed to demonstrate that Webster's testimony before the grand jury was false.  Accordingly, he is not entitled to federal habeas relief.

> **b.**  **Failure to Raise a Claim Concerning Agent French's Testimony to the Grand Jury that Most Cocaine comes from Outside the United States**

In his next claim for relief, Greer argues that his appellate counsel provided ineffective assistance in failing to raise a claim "challenging Agent French's testimony during the Grand Jury proceedings that most cocaine comes from outside of the United States."  ECF No. 1126 at 43. The specific testimony to which Greer objects is as follows:

> Q.  You mentioned the distribution of narcotics.  What kind of narcotics did the investigation indicate that these individuals were involved with?
>
> A.  Cocaine base.
>
> Q.  Based on your training and experience, does most cocaine come from outside the United States?
>
> A.  Yes.
>
> Q.  Does that mean that the group's distribution of cocaine affected interstate and foreign commerce?
>
> A.  Yes, it did.

ECF No. 1126-1 at 35.  Greer argues that Agent French's testimony was "improper opinion

56

testimony" and that it provided "the crucial link that gave the Grand Jury the power to indict Petitioner Greer under the Commerce Clause." ECF No. 1126 at 43-44. He argues that "had Agent French's improper testimony been challenged on appeal there would have been insufficient evidence that the racketeering crimes affected interstate commerce." *Id.* at 45.

Greer informs the court that cocaine may be used for legitimate medicinal purposes. He also states that "cocaine is manufactured in the state of California," and that "cocaine dispensed in this state generally comes from Los Angeles from the Merck Company and the balance comes from Mallincrodt and Penna, the other manufacturers, all of which are domestic." *Id.* at 44. He argues that French's testimony to the contrary is untrue "and the government knew that it was not true." *Id.* Greer also contends that Agent French did not know whether "the alleged cocaine was imported from any foreign country" and he failed to conduct "any tests" to make this determination. *Id.* In support of this claim, Greer cites *Turner v. United States*, 396 U.S. 398, 423 (1970), in which the Supreme Court made the following observation:

> While one can be confident that cocaine illegally manufactured from smuggled coca leaves or illegally imported after manufacturing would not appear in a stamped package at any time, cocaine, unlike heroin, is legally manufactured in this country; (footnote omitted) and we have held that sufficient amounts of cocaine are stolen from legal channels to render invalid the inference authorized in § 174 that any cocaine possessed in the United States is smuggled cocaine.

The government, on the other hand, argues that Greer has failed to demonstrate Agent French's testimony was inaccurate and that Greer has failed to effectively challenge the trial evidence which supported a finding of an interstate nexus. ECF No. 1184 at 66. The government also argues that any error in presenting the testimony of Agent French to the grand jury was cured by the guilty verdict after a trial. *Id.* at 65. *See Navarro*, 608 F.3d at 536; *Mechanik*, 475 U.S. at 70.

As the government points out, Greer's jury was instructed they had to find that the RICO enterprise affected interstate commerce. The jury verdict demonstrates they found such a nexus. Thus, any error in Agent French's testimony before the grand jury was harmless. *Mechanik*, 475 U.S. at 70 ("Measured by the petit jury's verdict, then, any error in the grand jury proceeding

57

connected with the charging decision was harmless beyond a reasonable doubt"). Counsel is not

ineffective in failing to raise a meritless argument. *See Jones v. Smith*, 231 F.3d 1227, 1239 n.8

(9th Cir. 2000) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)) (an attorney's failure

to make a meritless objection or motion does not constitute ineffective assistance of counsel)); *see

also Matylinsky v. Budge*, 577 F.3d 1083, 1094 (9th Cir. 2009) (counsel's failure to object to

testimony on hearsay grounds not ineffective where objection would have been properly

overruled); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action

can never be deficient performance"). Accordingly, Greer is not entitled to relief on this claim of

ineffective assistance of appellate counsel.

### c. Failure to Challenge Constructive Amendment of the Indictment and Legally Inadequate Theory Submitted to the Jury

In his next ground for relief, Greer claims that his appellate counsel rendered ineffective

assistance in failing to challenge "the constructive amendment of the indictment, as well as the

legally inadequate theory submitted to the jury." ECF No. 1126 at 45. Greer claims that the

government's introduction of evidence that the guns used in various crimes were transported in

interstate commerce (in order to provide the required link with interstate commerce) constituted a

constructive amendment of the indictment. Greer notes that he was not charged with any firearm

or ammunition violations (18 U.S.C. §§ 924(c) and 922(g)). *Id.* at 49. In other words, Greer

argues that the trial court allowed the jury to convict him based on the "legally inadequate theory"

that the nexus between PDF and interstate commerce could be proven by evidence about guns and

the transportation of guns, when he was not charged with any firearms offenses in the indictment.

*Id.* at 51. Greer also argues that the indictment charged that "drug distribution," and not firearm

use, "gave the government jurisdiction over this case." *Id.* at 47.

In support of this argument, Greer cites *Yates v. United States*, 354 U.S. 298 (1957),

*overruled on other grounds* by *Burks v. United States*, 437 U.S. 1 (1978), in which the United

States Supreme Court held that where a general verdict is supportable on one ground but an

alternative ground is invalid due to a statute of limitations bar, and it is impossible to tell which

ground the jury selected, the verdict must be set aside.  Greer argues that he was convicted on charges for which he had "no notice and thus no opportunity to plan a defense."  *Id.* at 53. He further claims that testimony about the use of firearms manufactured in another state constituted "a variance with the indictment."  *Id.*   He explains:

> The activities that the Grand jury relied upon to find that Petitioner Greer was in violation of the commerce clause was the distribution of cocaine base, as well as residents not being able to rent apartments or open businesses.  However, the jury in this case was erroneously given the option of finding Petitioner Greer guilty of a separate charge of a jurisdictional element that is required in a RICO prosecution.  That is the Commerce Clause violation.

*Id.* at 50.

Greer's jury was given an instruction which stated that the element of interstate commerce could be proved by the sale of illegal narcotics or the use of firearms and ammunition manufactured outside the state of California.  *Id.*  Greer argues that this constituted a constructive amendment of the indictment because he was not charged with use or possession of firearms.  He also argues that "none of any of the firearms that the government did seize were ever used in the charged crimes."  *Id.*  Greer contends that "the government could not have made the connection to interstate or foreign commerce without the illegal impermissible instruction to the jury concerning the weapons and ammunition that Petitioner Greer was not indicted for."  *Id.* at 52. Greer argues that "had his appellate counsel raised such issues under the relevant case law, his conviction would have likely been vacated by the Ninth Circuit Court of Appeals."  *Id.*

The government notes that the indictment alleges that PDF engaged in acts affecting interstate commerce, but does not specify which acts fulfilled that requirement.  ECF No. 1184 at 67; January 29, 2003 Indictment, ¶¶ 2, 6, 18.  More specifically, the indictment did not limit those acts to distribution of drugs and did not state that "drug distribution gave the government jurisdiction over this case."  Citing *United States v. Fernandez*, 388 F.3d 1199, 1218-19 (9th Cir. 2004), the government argues that the indictment in this case is legally sufficient even though it alleges that PDF engaged in and conducted activities that affected interstate and foreign

/////

/////

59

commerce without specifying those activities.[13]  *Id.* at 68.  The government contends that Greer's

argument that the indictment was constructively amended is "patently frivolous."  *Id.* at 69.[14]

The government also argues that admitting evidence that the guns used in the various

predicate acts traveled in interstate commerce, in order to satisfy the interstate commerce element

of RICO, even when no gun charges were alleged, does not constitute a constructive amendment

to, or a fatal variance of the indictment.  The government reasons that: (1) only a *de minimus*

showing of impact on interstate commerce is required, and showing guns traveling in interstate

commerce is "a very common method of proof of such elements;" and (2) Greer could have

anticipated from the indictment that the gun evidence would be presented at trial.  The

government points out that the prosecutor stated in her opening remarks that she would be

presenting evidence that the guns used in some of the predicate racketeering acts had traveled in

interstate commerce, in order to prove an effect on interstate commerce.  Specifically, the

prosecutor argued:

> Fourth and finally, the government is required to prove that this enterprise had an effect on interstate commerce, and that can be minimal.  The evidence in this case is that cocaine, heroin – those are drugs that are not manufactured in the State of California.  They're manufactured in foreign countries.  That has an effect on interstate commerce, and that will be the evidence at trial.
>
> Weapons that were used will also – you'll hear evidence those are manufactured outside the State of California.  That will be offered as further evidence of further activities of the enterprise that effect interstate commerce.

RT Dec. 5, 2005, at 64.

/////

---

[13]  In *Fernandez*, the Ninth Circuit held that an indictment under the RICO statute need not set forth facts alleging how interstate commerce was affected or state any theory of interstate impact.  *Fernandez*, 388 F.3d at 1218-19.

[14]  One of Greer's co-defendants filed a motion to dismiss in the trial court, claiming that the indictment was insufficient in failing to set forth facts alleging how interstate commerce was affected by the actions of the criminal enterprise.  ECF No. 375 (sealed).  At the hearing on that motion the trial judge concluded, relying on the *Fernandez* decision, that "an Indictment need not set forth facts alleging how interstate commerce was effected or state any theory of interstate impact."  RT Sept. 19, 2005, at 28.  The judge ruled that "the ability to prove nexus at trial is a matter for trial, not for dismissal of an Indictment consideration."  *Id.* at 29.

The government also argues that Greer waived any claim of variance in failing to request a continuance of trial in order to meet the government's offer of proof. ECF No. 1184 at 69. *See Ridgeway v. Hutto*, 474 F.2d 22, 24 (8th Cir. 1973) (per curiam) (no fatal variance where "there is no indication that the appellant was surprised by the variant proof and no motion was made to the court for a continuance for the purpose of preparing a new defense"); *United States v. Costello*, 381 F.2d 698, 701 (2d Cir. 1967) (no fatal variance where defendant "did not claim surprise below or request a continuance"). The government contends that, under the circumstances set forth above, Greer's appellate counsel did not render ineffective assistance in failing to raise a claim of constructive amendment or variance of the indictment. *Id.* at 70.

"A defendant in a felony trial can only be convicted of charges upon which a grand jury has returned an indictment." *United States v. Arreola*, 467 F.3d 1153, 1162 (9th Cir. 2006). "It is the exclusive prerogative of the grand jury finally to determine the charges, and once it has done so neither a prosecutor nor a judge can change the charging part of an indictment to suit [his or her] own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes." *United States v. Leichtnam*, 948 F.2d 370, 375–76 (7th Cir. 1991) (quoting *Ex parte Bain*, 121 U.S. 1, 10 (1887)) (alteration in original) (internal quotation marks omitted); *see also United States v. Miller*, 471 U.S. 130, 138 (1985); *Stirone v. United States*, 361 U.S. 212, 216 (1960).

"An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Jingles*, 702 F.3d 494, 500 (9th Cir. 2012) (quoting *United States v. Von Stoll*, 726 F.2d 584 (9th Cir. 1984) (quoting *United States v. Cusmano*, 659 F.2d 714, 718 (6th Cir. 1981)). An indictment is constructively amended where "the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment." *United States v. Streit*, 962 F.2d 894, 899-900 (9th Cir. 1992). "A variance involves a divergence between the allegations set forth in the indictment and the proof offered at trial." *United States v. Ward*, 747 F.3d 1184, 1189 -1190 (9th Cir. 2014). Put another way, a variance occurs "when the charging terms of the indictment are

61

1   left unaltered, but the evidence offered at trial proves facts materially different from those alleged

2   in the indictment." *Jingles*, 702 F.3d at 500.  The terms "variance" and "amendment" "can, and

3   often do, mean the same thing."  *Id.*

4           Assuming arguendo that Greer's claim in this regard was not waived for purposes of

5   appeal, it must be denied.  The indictment in this case did not state that the nexus to interstate

6   commerce was solely the result of PDF's drug distribution.  As set forth above, it was more

7   broadly worded.  Pursuant to the authorities cited above, when the nexus requirement has been

8   broadly stated in the indictment the introduction of evidence to show an interstate nexus does not

9   necessarily constitute a fatal variance.  The introduction of evidence about use of firearms to

10  show a nexus to interstate commerce in this case did not constitute facts "materially different"

11  from the general allegations contained in the indictment.  This can be demonstrated by the fact

12  that none of the defendants objected or showed any surprise during trial when this evidence was

13  discussed or introduced.  There is also no reasonable possibility in this case that Greer was

14  convicted of an offense other than that charged in the indictment simply because the government

15  introduced evidence of gun use in order to support the element of interstate commerce.

16          Appellate counsel's decision not to include this claim in Greer's direct appeal, but instead

17  to focus on claims that counsel believed were more meritorious, was "within the range of

18  competence demanded of attorneys in criminal cases."  *McMann*, 397 U.S. at 771.  Accordingly,

19  Greer is not entitled to federal habeas relief on his claim that his appellate counsel rendered

20  ineffective assistance in failing to challenge the constructive amendment of the indictment.

21          **d.      Failure to Challenge Insufficiency of Evidence to Support a**

22                   **RICO Conviction under 18 U.S.C. §§ 1962(c),(d)**

23          Greer claims that his appellate counsel rendered ineffective assistance in failing to

24  challenge the evidence offered by the government to support the RICO charge.  Specifically, he

25  argues that the "government adduced insufficient evidence to prove that the Pitch Dark Family

26  was a criminal enterprise within the meaning of 18 U.S.C. § 1961(4)."  ECF No. 1126 at 60.

27  Greer argues that PDF "lacked the organizational infrastructure and decision-making apparatus

28  required of a RICO enterprise."  *Id.*  According to Greer, PDF did not have a hierarchical

structure, or any mechanism for controlling and directing the affairs of the group. *Id.* at 63. He contends that the witnesses who testified at his trial about the structure and membership of PDF were unclear, contradictory, inconclusive and, at times, contradicted the government's theory that PDF was a criminal enterprise. *Id.* at 64.

Greer also contends there was insufficient evidence he "conspired with anyone" to commit crimes, that he had any particular role in the organization, or that there was "any ascertainable structure distinct from the alleged racketeering activity itself." *Id.* Greer argues that the criminal acts committed by PDF members were individual crimes, unconnected with the group or its goals. *Id.* at 63-64. He notes there was testimony indicating that other drug dealers operated or were allowed to operate in PDF territory and that PDF did not try to "protect turf." *Id.* at 64-67. Greer argues,

> none of the governments witnesses testified that Petitioner Greer conspired to belonged to a consensual decision-making, structured organization. Nor did the witnesses prove that Greer was a part of a continuing unit.

*Id.* at 86.

In a related argument, Greer claims that his appellate counsel rendered ineffective assistance in failing to raise a claim that the evidence introduced at his trial was insufficient to support his RICO conviction because the government failed to show he "conspired to engage in PDF's enterprise 'through a pattern of racketeering activity' as required by 18 U.S.C. § 1962(c). *Id.* at 108-09. Specifically, Greer argues that the alleged racketeering acts were not interrelated or a part of continued racketeering activity, but were only isolated or sporadic criminal acts. *Id.* at 109-110. Greer also emphasizes that the government's trial witnesses were not credible and that they failed to prove the elements of a racketeering charge. Greer summarizes his argument in this regard as follows:

> A review of the evidence produced at trial establishes that there was insufficient proof to establish beyond a reasonable doubt that PDF was (1) an "enterprise," having (2) a "common purpose," (3) that PDF functioned as a "continuing unit" and (4) that Greer and [co-defendant] Walker participated in a "pattern of racketeering activities" conducted by PDF.

ECF No. 1205 at 14.

18 U.S.C. § 1961 (4) defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The indictment in this case alleged that the PDF enterprise was "a group of individuals associated in fact," whose members "functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." ECF No. 1 at 2. *See United States v. Turkette*, 452 U.S. 576, 583 (1981) (an associated-in-fact enterprise "is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct"). An associated-in-fact enterprise may be proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

A RICO enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct," proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* In order to prove the racketeering charges against Greer and Jason Walker, the prosecution was required to demonstrate beyond a reasonable doubt that Greer and Walker were involved in an "enterprise" that conducted a "pattern of racketeering activity;" that is, at least two acts of racketeering activity within ten years. *Id.*; 18 U.S.C. § 1961(4), (5). The acts had to be shown to have been related to each other and to "pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

Racketeering acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. A pattern of racketeering activity "is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise." *Id.* "While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other.´ *Id.*

There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

1    elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

2    (1979). "[T]he dispositive question under *Jackson* is 'whether the record evidence could

3    reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d

4    978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). "A reviewing court may set aside

5    the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

6    agreed with the jury." *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *3 (2011).

7    Greer has failed to meet *Strickland*'s deficient performance component with respect to his

8    claim that appellate counsel improperly failed to raise a claim of insufficient evidence to support

9    the RICO charge. Appellate counsel did not render ineffective assistance in focusing on the

10   prosecutorial misconduct and admission of evidence claims that he raised on appeal, rather than

11   challenging the sufficiency of the evidence to support Greer's RICO conviction. Appellate

12   counsel need not raise every non-frivolous issue. *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

13   "'[O]nly when ignored issues are clearly stronger than those presented, will the presumption of

14   effective assistance of counsel be overcome.'" *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646

15   (7th Cir. 1986)). An appellate advocate provides effective assistance by "winnowing out" a

16   weaker claim and focusing on a stronger claim. *See Strickland v. Washington*, 466 U.S. 668, 689

17   (1984) ("Judicial scrutiny of counsel's performance must be highly deferential."). *See also Jones*

18   *v. Barnes*, 463 U.S. 745, 746 (1983) (an experienced attorney knows the importance of

19   "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at

20   most on a few key issues"); *Smith v. Murray*, 477 U.S. 527, 536 (1986) ("Th[e] process of

21   winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far

22   from being evidence of incompetence, is the hallmark of effective appellate advocacy.").

23   In light of the extensive evidence introduced at Greer's trial, set forth above, reflecting

24   that PDF was an organization of associated individuals who engaged in a pattern of conduct,

25   including murder, attempted murder, and sales of controlled substances, within a ten year period,

26   appellate counsel's decision to focus on claims that he believed had more merit than a claim

27   challenging the sufficiency of the evidence to support a RICO charge did not constitute deficient

28   performance under *Strickland*. In this regard, the court also notes that the Ninth Circuit

1   concluded there was "strong, independent evidence of [Greer's and co-defendant Jason Keith

2   Walker's] involvement with the alleged racketeering organization." *Walker*, 391 F. App'x 638 at

3   *2.[15]

4         Furthermore, even if appellate counsel was deficient in failing to raise all non-frivolous

5   claims, Greer has failed to demonstrate prejudice. The evidence introduced at Greer's trial, when

6   viewed in the light most favorable to the verdict, was sufficient to demonstrate that the activities

7   of PDF constituted a racketeering enterprise under the authorities cited above. Detective

8   Fowler's testimony that PDF was a drug dealing enterprise in West Vallejo was based, in part, on

9   the fact that "six different members of Pitch Dark Family made statements about Pitch Dark

10  Family . . . all separately admitted they were members of Pitch Dark Family, which was an

11  association of individuals engaged in gang-related activities." RT Feb. 15, 2006, at 7794. Other

12  government witnesses testified about the nature and existence of PDF, including its territory,

13  activities and leadership, and the nature of the crimes committed by the group. The jury chose to

14  credit this evidence. *Johnson*, 132 S.Ct. at 2064 (juries have "broad discretion in deciding what

15  inferences to draw from the evidence presented at trial").

16        The fact that Greer believes some of the witnesses who testified for the government were

17  not credible is immaterial. If the record supports conflicting inferences, the reviewing court

18  "must presume – even if it does not affirmatively appear in the record – that the trier of fact

19  resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

20  *McDaniel,* 558 U.S. at 133 (per curiam) ( quoting *Jackson*, 443 U.S. at 326). In evaluating the

21  evidence presented at trial, this court may not weigh conflicting evidence or consider witness

22  credibility. *Wingfield v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997). Given the record

23  evidence in this case, viewed in the light most favorable to the jury's verdict, a rational trier of

24  _____

25        [15]   The government points out that there is a different appellate standard of review
    applicable to this claim, depending on whether the defendant raised or did not raise a motion for a
26  judgment of acquittal pursuant to Fed. R. Crim. P. 29. ECF No. 1184 at 70-71. The trial record
    is inconclusive with regard to whether Greer filed such a motion. However, regardless of the
27  standard of review that would have been applicable to an appellate claim of insufficient evidence,
    this court concludes, for the reasons stated above, that Greer's appellate counsel did not render
28  ineffective assistance in failing to raise such a claim.

66

fact could have concluded that PDF was a RICO enterprise.  Accordingly, Greer did not suffer

prejudice from his appellate counsel's failure to raise this issue on appeal.

### e. Failure to Raise Appellate Claims that the Evidence was Insufficient to Support Greer's Aiding and Abetting Convictions for the Attempted Murder of Jason Hickerson and the murders of Keith Roberts, Richard Garrett, and Larry Cayton; and the Allegation that Greer Engaged in an Enterprise Through a Pattern of Racketeering

Greer argues that his appellate counsel rendered ineffective assistance in failing to raise a

claim that the evidence introduced at his trial was insufficient to support his convictions relating

to the attempted murder of Hickerson and the murder of Roberts and Garrett.  ECF No. 1126 at

89.  Specifically, Greer argues that "the evidence was insufficient to show that the Attempt [sic]

Murder of Jason Hickerson, the murders of Keith Roberts, Richard Garrett was done with the

statutorily required motive – to maintain or increase his position within a racketeering enterprise,"

as required for a conviction under 18 U.S.C. § 1962(d).  *Id.* at 90.

Greer argues that Jason Hickerson was assaulted for personal reasons related to his

stealing activities, and not for reasons related to the business of PDF.  He contends there was not

a "scintilla" of evidence that he conspired to assault Hickerson in order to increase his position

within the PDF enterprise, to enrich the membership of PDF, or to protect turf.  *Id.* at 93.  Greer

also argues, "there is no evidence from which the jury could have concluded that Petitioner

Greer's motive for wanting to assault Jason Hickerson was other then purely speculative and

mercenary."  *Id.* at 91.  He contends that "[n]othing was testified to that states 'PDF' as a group

did anything . . . It was all alleged individualism."  *Id.*

With regard to Richard Garrett, Greer argues that Garrett was murdered "because of a

personal relationship with Nashita Jones at best."  *Id.* at 95.  He argues Garrett's murder had

"nothing to do with PDF's alleged drug enterprise or even the selling of firearms."  *Id.*

With regard to Keith Roberts, Greer argues that the government's "theory of Roberts

murder was never produced to the jury so that the jury could decide why his murder occurred. . .

67

Therefore, there was insufficient evidence to prove that Petitioner Greer conspired to murder Keith Roberts to enrich members or protect turf on behalf of PDF, as an organization." *Id.* at 97.

Greer also argues there was insufficient evidence that he committed the murder of Larry Cayton "for the purpose of 'maintaining or increasing' his position within PDF enterprise under § 1962(c) & (d)." *Id.* at 98. He contends that "there is no evidence from which the jury could conclude that Petitioner Greer's motive for aiding and abetting the murder of Larry Cayton was other than purely mercenary." *Id.* at 101. He notes that the only testimony introduced at his trial regarding the motive for the Cayton murder came from Derrick Shields. *Id.* Shields testified that he (Greer) told him that he had no choice but to kill Cayton because Cayton was "starting to talk too much to other people about confidential information that was supposed to stay between Petitioner Greer and Cayton." *Id.* at 101. Greer insists that Shields' testimony in this regard does not support the government's theory that Cayton's murder was in response to a threat to the PDF organization or to his position as a PDF leader, or that it was committed in order to increase Greer's position within the organization. *Id.* Thus, Greer contends, the argument that the Cayton murder was committed in furtherance of a racketeering enterprise is "based on no more than guesswork." *Id.* at 102.

Greer also contends that there was insufficient evidence he aided and abetted the Cayton murder. *Id.* at 103. Specifically, he argues there was no evidence he "shared some intent with the unamed individuals (who shot Cayton) and took some affirmative action to assist them in carrying out their plan to kill Cayton." *Id.* He explains:

> Petitioner Greer was not a member of a conspiracy with alleged white males that killed Cayton. In addition, the charges in this case were for drug violations. Larry Cayton's murder did not pertain to the PDF alleged drug crimes that threatened PDG's alleged drug operation.

*Id.* at 107. Greer's argument continues that: "there was no testimony provided to the jury that Petitioner Greer knew it was expected of him to aid and abet the murder of Larry Cayton, nor that he aided and abetted it in furtherance of that membership." *Id.* at 107-08. Greer's claim before this court is that his appellate counsel rendered ineffective assistance in failing to challenge his

/////

conviction for aiding and abetting the murder of Larry Cayton on the grounds described above, instead of "offering weaker arguments." *Id.* at 108.

The government responds that these challenges by Greer to the sufficiency of the evidence are moot because "the element [Greer] claim[s] the government failed to prove is not an element of any crime of which [Greer was] convicted." ECF No. 1184 at 75. Greer dismisses this assertion as "incomprehensible." He notes that he was convicted of Counts One and Two of the indictment, which allege racketeering activities pertaining to the attempted murder of Jason Hickerson and the murders of Roberts, Cayton and Garrett. ECF No. 1205 at 93-94.

Assuming arguendo that these claims of ineffective assistance of appellate counsel are not moot, they nonetheless must be denied. The indictment in this case alleged that the racketeering enterprise existed "no later than on or about January 1, 1994, through on or about July 30, 2000." ECF No. 1 at 4. The indictment also alleged the purposes of the racketeering enterprise, as follows:

- Enriching the members and associates of the enterprise through, among other things, murder, attempted murder, and distribution of narcotics.
- Preserving and protecting the power, territory and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults and murder.
- Promoting and enhancing the enterprise and its members' and associates' activities
- Keeping victims in fear of the enterprise and in fear of its members and associates through violence and threats of violence.

*Id.* at 2-3. The indictment also alleged predicate acts related to the enterprise; to wit, three murders in 1994, an attempted murder in 1994, possession of cocaine base for sale in 1997, a murder in 1998, possession with intent to distribute cocaine base in 1998, the murder of Larry Cayton in 2000, and a conspiracy to sell narcotics from 1994 to 2000. *Id.* at 5-8.

In Count Two, the indictment alleged that from on or about January 1, 1994 through July 30, 2000, Greer and other co-defendants conspired to conduct the affairs of PDF, an enterprise, through a pattern of racketeering activity consisting of the predicate acts set forth above. *Id.* at 8-9. It was also alleged that it was part of the conspiracy that each defendant agreed that a

conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise. *Id.* at 9.

This court concludes that Greer has failed to demonstrate he was prejudiced by his appellate counsel's failure to raise these claims of insufficient evidence on appeal. After a careful review of the record in the light most favorable to the verdict, the court finds there was sufficient evidence introduced at Greer's trial to support his convictions on Counts One and Two, including the allegations related to the attempted murder of Jason Hickerson and the murders of Keith Roberts, Richard Garrett, and Larry Cayton. The court reaches this conclusion even though some of the trial testimony was conflicting and/or impeached. As explained above, this court must defer to the jury's resolution of any conflicts in the evidence and must not weigh that evidence itself or consider witness credibility. *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam) (quoting *Jackson*, 443 U.S. at 326); *Wingfield*, 122 F.3d at 1332. As the Ninth Circuit has explained, "[t]he relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991). Put another way, this court need not find that the conclusion of guilt was compelled, only that it rationally could have been reached. *Drayden v. White*, 232 F.3d 704, 709-10 (9th Cir. 2000). The jury verdict in this case satisfies these standards. Even if appellate counsel was deficient in failing to raise these non-frivolous claims on appeal, Greer has failed to demonstrate prejudice, or that he probably would have prevailed. Accordingly, Greer is not entitled to federal habeas relief.

### f.  Improperly Allowing Detective Fowler to Testify as a Gang Expert under Rule 16(a)(1)(G)

Greer claims that his appellate counsel rendered ineffective assistance in failing to raise a claim that his trial counsel: (1) improperly failed to challenge the testimony of Detective Fowler on the grounds that Fowler was not competent to establish that PDF was a RICO enterprise; and (2) improperly failing to challenge Fowler's testimony on the grounds that the government failed to comply with Fed. R. Crim. P. 16(a)(1)(G).

/////

As discussed above, Greer's trial counsel did challenge the admission of Detective Fowler's trial testimony on both of these grounds. Appellate counsel's failure to raise this frivolous claim on appeal does not constitute ineffective assistance. *Jones*, 231 F.3d at 1239 n.8; *Boag*, 769 F.2d at 1344; *Rhoades*, 596 F.3d at 1179; *Rupe*, 93 F.3d at 1445.

### 4. Claims Based on Prosecutorial Misconduct

### a. Testimony of Charles McClough

Greer claims that the government violated his right to due process in knowingly presenting the false testimony of Charles McClough and that his appellate counsel rendered ineffective assistance in failing to raise this claim on appeal. ECF No. 1126 at 145. Greer argues that McClough "was subject to unlawful threats, and official misconduct which forced him to testify falsely." *Id.* He asserts that he is entitled to an evidentiary hearing to determine whether McClough's testimony regarding his "alleged recantation" is truthful. *Id.*

The background to this claim is the following. At the beginning of McClough's trial testimony, he stated that there were several gangs in West Vallejo when he was growing up there, including PDF, and that all of these gangs were "allies." RT Jan. 12, 2006, at 5483-86. When he was asked whether Greer was in a gang, he stated he did not want to testify. *Id.* at 5486-87. The court then took a recess. *Id.* In a conference outside the presence of the jury, the trial judge was told that McClough refused to testify because someone in jail had threatened him. *Id.* at 5496. Defense counsel expressed concern that if McClough resumed the witness stand and explained why he didn't want to testify, the jury would assume the defendants had something to do with the threat. *Id.* at 5496-97. The court ruled that neither side could ask Mr. McClough in front of the jury why he had refused to testify. *Id.* at 5501.

When he resumed the witness stand, McClough testified about the structure and membership of PDF. He identified the following individuals as members of PDF: "Bowleggs," "EJ Rabb," "Tone," "Fade," Lou Walker, Greer, Elliott Cole, "Shady," Oscar Gonzalez, and Arnando Villafan. *Id.* at 5504-06. McClough stated that he personally witnessed PDF members selling guns and drugs (cocaine and heroin) on the west side. *Id.* at 5507-10.

/////

McClough also testified about the murders of Keith Roberts and Devin Russell.  He stated that in March, 1995, Walker and White told him that the two of them, along with Greer and Marc Tarver, were involved in the Keith Roberts homicide.  *Id.* at 5513, 5515, 5517-18.  According to McClough, White told him that several of them participated in the shooting.  *Id.* at 5518:12-17. McClough testified that the subject of Roberts's murder came up again approximately a week later at Marc Tarver's residence, where White, Tarver, and Walker again talked about the killing. *Id.* at 5519.  The subject came up a third time, again at Tarver's residence, with the same participants, except that Greer was also present.  *Id.* at 5520-21.  During one of these conversations, it was revealed that while several different people in the group had shot Roberts, Walker had taken the final and fatal shot.  *Id.* at 5528-29.  Neither Greer nor Walker disputed what was said at these meetings.  *Id.* at 5526-27.

With respect to the murder of Devin Russell, McClough testified that Elliott Cole told him that "something needed to happen" to Russell to punish him for testifying against Cole in the Jewel Hart homicide, which resulted in Cole going to prison.  *Id.* at 5530.  According to McClough, White and Arnando Villafan told him that White shot Russell with a 12-gauge shotgun.  *Id.* at 5532-34.  McClough was told that White's initial plan was to shoot Russell from the roof overlooking an alley where others were leading Russell.  *Id.* at 5534.  When White tried to shoot Russell from the roof, however, the shotgun jammed.  *Id.* at 5534-35.  After the jam was fixed, he shot Russell twice.  *Id.* at 5535.[16]

Approximately a month after this testimony, McClough was called to the witness stand by the defense.  At that time, he recanted his trial testimony, claiming that he had been threatened by FBI agents and that the FBI had suggested to him what he should say at trial.  RT Mar. 1, 2006 at

/////

---

[16]  McClough's trial testimony that the various gangs in western Vallejo were "allies," his identification of the members of Pitch Dark Family, and his description of the killing of Devon Russell, is consistent in many respects with his prior testimony before the grand jury and during FBI interviews.  *See* ECF No. 1184-8 at 4-5, ECF No. 1191-1.  During his second testimony before the grand jury, McClough refused to testify based on threats to him and his family from other inmates with whom he was incarcerated.  ECF No. 1191-1 at 4-6.  After speaking further with FBI agents on the case about his safety concerns, McClough resumed his testimony.  *Id.* at 6.

8551. McClough stated that when he took a break during his initial testimony, he had a

conversation with FBI Agent French about the following:

> About my kids and I must testify because they – you know, they can take care of my kids because they already knew that my kids had been took before. So they manipulated me and tell me, you know, I better do this. If you don't, people are going to kill me, and this and that. And, you know, by them utilizing my kids like that, I was forced.

*Id.* McClough further testified that FBI Agent French

> told me he was going to take – because my wife has a mental problem. So my kids had got took before, and he didn't say – he was going to make sure that my kids don't get took, and he would provide housing for my wife and all this. He manipulated me.

*Id.* at 8556.

McClough then testified that PDF was "nothing but a rap group." *Id.* at 8552. He

testified the FBI "was putting the emphasis towards me, if I didn't say that certain things, would

happen to me." *Id.* He stated the FBI was "coaxing [him] on what to say" and suggesting what

he should and should not say during his testimony. *Id.* at 8552-56, 8557-58. For instance, Agent

French told McClough not to say that the murder of Roberts took place in an alley. *Id.* at 8557.

McClough later elaborated:

> What they told me to lie about is the alley and all the stuff that I didn't know nothin' about. You know, they brought this to me. He said – you know, they said he died here and this is what happened and this is how they shot him. I didn't know nothin' about that.

*Id.* at 8575.

When he was asked whether any of his previous testimony had been "false," McClough

stated: "Well, not really false, it just – the particular questions, when asked to me, how they're

asked to me now." *Id.* at 8559. He explained that he didn't want to see "no innocent people go to

jail." *Id.* at 8560. McClough acknowledged that during his previous testimony he stated that he

had not been threatened or pressured by the FBI for his testimony, but he stated that this

testimony was "inaccurate." *Id.* He also acknowledged that he had previously denied the FBI

had threatened to take his children away from him, but he stated that testimony was not true

either.  *Id.* at 8561.  McClough explained, "[t]hey threatened in certain ways to take my kids, but they made it sound a little – you know, where if I don't say certain things, that they're going to . . . make sure that my wife, you know, basically ain't going to have no control over my kids."  *Id.* at 8561-62.  McClough also testified that FBI Agent French indicated he could "take care" of a pending criminal case against McClough in exchange for favorable testimony, and that the FBI would ensure he was housed in Yolo County so that he could see his family.  *Id.* at 8562-63.

McClough denied that the reason he refused to proceed with his initial testimony was that he had received a threat from a jail inmate.  *Id.* at 8565-66.  He explained that he didn't think the message he got from the inmate was a threat.  *Id.* at 8566.  He stated that he stopped testifying in order to give the prosecutor the following information:

> Only thing I said is this person knows my family and knows where my wife stays at.  That's only – that's the only sing [sic] I said, sir.  That's the only thing I said.  And you guys blew it out of proportion because you guys told me that, Hey, we're going to put you here where no one knows you at, and this and that.  And I just, you know, brought it to your attention.  That was it, sir.

*Id.* at 8570.

After McClough's recantation, several FBI agents testified that McClough was never threatened, intimidated, or coached by the FBI.  RT Mar. 14, 2006, at 9633, 9677-79, RT Mar. 9, 2006, at 9457-58.  In addition, FBI Agent David Sesma testified:

> Q.  Now, did Mr. McClough indicate to you and Agent French and to me the reason for his reluctance to testify?

> A.  Yeah.  He received a threat when he was at the Yolo County Jail from an individual known to him as Bracie, and Bracie had indicated to Mr. McClough that he knew where his family lived and he also knew that a cousin had lived down the street.

> And I think Mr. McClough took this as a direct threat that this guy had talked to him.  And Bracie also indicated that he knew that Bowleggs was out, which is a someone [sic] indicted in the case.

> * * *

> Q.  Did Mr. McClough express any concern about this?

> A.  Yes, he did.

> Q.  How much concern?

74

A.  I think that was part of the reason why he didn't want to testify was because of this threat.

RT Mar. 14, 2006, at 9632-33.

In his claim before this court, Greer argues that McClough "was pressured to testify falsely in this case and that the government was fully aware that he was providing false testimony." ECF No. 1126 at 150.  Greer argues that "the police knew that Charles McClough was testifying about events and situations that he did not know anything about." *Id.*  Greer contends that "a Due Process violation occurred in this case because the government left his conviction in place after a credible recantation of material testimony." *Id.* at 162.

Greer's claim that his appellate counsel rendered ineffective assistance in not pursuing these claims of prosecutorial misconduct on appeal lacks merit.[17]  To demonstrate ineffective assistance of counsel, Greer must show prejudice, or that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Greer is unable to make this showing.

It is clearly established that "a conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985).  *See also Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The due process requirement voids a conviction where the false evidence is 'known to be such by representatives of the State.'") (quoting *Napue*, 360 U.S. at 269 (1959).  This rule applies even where the false testimony goes only to the credibility of the witness. *Napue*, 360 U.S. at 269; *Mancuso v Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  There are three components to establishing a claim for relief based on the prosecutor's introduction of perjured testimony at trial.  Specifically, the petitioner must establish that: (1) the testimony or evidence was actually false; (2) the prosecutor knew or should have

_____

[17]  Greer's claims, if any, that the prosecutor committed misconduct in introducing the knowingly false testimony of McClough, and that the government violated his right to due process by leaving his conviction "in place" after McClough recanted his testimony are not cognizable in this § 2255 motion because they could have been raised on direct appeal. *Sunal*, 332 U.S. at 178; *Frady*, 456 U.S. at 168.

known that the testimony or evidence was actually false; and (3) the false testimony or evidence was material. *Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010). Mere speculation regarding these factors is insufficient to meet petitioner's burden. *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991). However, "[w]here the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts," even if the "defense counsel knows, and the jury may figure out, that the testimony is false." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

The Ninth Circuit has held that a conviction based on false testimony, even without any evidence of prosecutorial misconduct in presenting the testimony, may result in a violation of a defendant's due process rights under the Fourteenth Amendment. *Maxwell v. Roe*, 628 F.3d 486, 506-07 (9th Cir. 2010) ("[A] defendant's due process rights were violated ... when it was revealed that false evidence brought about a defendant's conviction."); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("we assume without deciding that the prosecutor neither knew nor should have known of Masse's perjury about his deal. Thus our analysis of the perjury presented at Killian's trial must determine whether 'there is a reasonable probability that [without all the perjury] the result of the proceeding would have been different.'"); *Hall v. Director of Corrections*, 343 F.3d 976, 981–82 (9th Cir. 2003) (use of jailhouse notes, subsequently proven to have been altered from their original state without knowledge of the prosecutor, violated defendant's right to due process).

In this case, Greer has failed to demonstrate that the trial testimony initially given by McClough was actually false or that the prosecutor knew or should have known that it was false. Indeed, when asked whether any of his previous testimony had been "false," McClough stated: "Well, not really false." RT Mar. 1, 2006, at 8559. The government believed, and still believes, that McClough's initial trial testimony was true. Further, the jurors heard McClough's initial testimony and also his recantation of that testimony. Notwithstanding the recantation, the jury found Greer guilty of the charges against him. Under these circumstances, there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Bagley*, 473 U.S. at 679 n.9.

Appellate counsel's decision not to include this claim in Greer's direct appeal, but instead to focus on claims that counsel believed were more meritorious, was "within the range of competence demanded of attorneys in criminal cases." *McMann*, 397 U.S. at 771. Accordingly, Greer is not entitled to relief on this claim of ineffective assistance of counsel.

**b. Failure to Disclose Compensation Paid to Witness Derrick Shields**

Greer claims that the prosecution violated his federal constitutional rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264, 269 (1959) and *Giglio v. United States*, 405 U.S. 150, 153-55 (1972) when it: (1) failed to disclose to the grand jury or to defense counsel that witness Derrick Shields was paid by the FBI for information and testimony; (2) failed to correct Shields' trial testimony that he had not received payments from the FBI; and (3) failed to turn over FBI notes that document the payments that were distributed to Shields. ECF No. 1126 at 57-58; ECF No. 1205 at 81-84.

Greer has attached to his § 2255 motion an FBI memo dated December 12, 2001, and signed by FBI Special Agents Butler and French. The memo states:

> A few days ago, Source saw GREER on the street in Vallejo and GREER was looking at him in an intimidating manner. Source approached GREER and began a conversation with him. Source stated that GREER knew how much money that the FBI had provided to Source.

ECF No. 1126-1 at 53. "Source" (apparently Derrick Shields) later informed the agents that he would no longer cooperate in the criminal action against Greer and Jason Walker. *Id.* Greer argues this memo demonstrates that Shields was "paid money to be a confidential informant in this case." ECF No. 1126 at 58. He states that "this information was never turned over to Petitioner Greer during trial." *Id.* Greer further argues that "the only reasonable inference that could be made is that the money that was given to Shields was paid to him to testify." *Id.* Greer argues that if he had known about these payments, "he would have been able to pursue discovery and used that information as powerful impeachment testimony." *Id.*

Derrick Shields testified at Greer's trial that he never had a conversation with Greer about money paid to him by the FBI, and that he "never was paid any money." RT Feb. 9, 2006, at 7337-38. His testimony was as follows:

Q. Now, let me ask you this: You told us that the FBI didn't do anything for you to get your testimony; is that right?

A. Yes.

Q. You're sure about that, right?

A. Yes.

Q. Now, in 2000 or 2001, did Shango Greer come up to you and say that the word's out on the street that you got $3500 from the FBI?

A. No.

Q. That never happened?

A. No.

Q. Well, do you remember telling the FBI in an interview on December the 12th of 2001, by agents Butler and French, that Greer knew how much money that the FBI had provided to you?

Did you tell them that?

A. I don't remember saying that because I didn't get no money.

Q. You don't remember saying that to the FBI, to Agent French, who is here, and Agent Butler on December the 12th of 2001?

A. No. I don't remember saying that.

Q. You never told them that?

You never complained that, "Hey, Shango Greer knows how much money you guys paid me?

You never complained like that to them?

A. Never was paid any money.

*Id.* at 7337-38.

Greer argues that this testimony by Shields was false and that the government's failure to correct the testimony violated his right to due process. He argues, "the government knew that Derrick Shields had been compensated for his cooperation and testimony and never interposed in this case." ECF No. 1126 at 59. He argues that evidence concerning payments to Shields by the FBI was material because:

/////

78

> Perjuring Derrick Shields would have excluded the testimony about Shields testifying about Petitioner Greer's alleged ties to "PDF". Thus, destroying a critical element of the RICO violation. In addition, had Petitioner Greer been able to impeach him, his testimony about Petitioner Greer selling drugs would have been discredited. Therefore, the false testimony was material to the charges brought against Petitioner Greer.

*Id.*

The government counters that Greer and the other defendants were aware by the time of trial that Shields had received payment from the FBI because the FBI memo signed by Agents French and Butler was provided to them in discovery. ECF No. 1184 at 89. The government argues that Greer's trial counsel must have used the information in this FBI memo that it received in discovery to impeach Shields at trial. *Id.*[18]

Attached to the government's answer is a June 1, 2001 letter from FBI Special Agent Michael C. Riedel to the United States Attorney for the Eastern District of California informing him that a cooperating witness (presumably Derrick Shields) had been released from prison and was paid a total of $3,150.00 for "lodging, transportation, communication, meals, and entertainment in furtherance of the investigation." ECF No. 1184-7. This letter also reflects that the cooperating witness received a sentence reduction and a prison transfer in exchange for his cooperation and assistance to the FBI. *Id.* Also attached to the answer is a June 4, 2001 letter from "AUSA Jodi B. Rafkin" to defense counsel Johnny L. Griffin, which reflects that the June 1, 2001 letter was turned over to the defense in discovery on June 4, 2001. *Id.* at 2. However, in its answer, the government clarifies that the June 1, 2001 letter was actually turned over to Greer's co-defendant, Jason Walker, in an earlier case against Walker. ECF No. 1184 at 90. Government counsel concedes, in the absence of evidence to the contrary, that the June 1, 2001 letter was not "formally produced" to Greer in the instant case. *Id.* at 92 n.51. However, he suggests that Walker must have shared this letter with others, including Greer, "resulting in Greer approaching Shields sometime in December 2001 to confront him about getting paid." *Id.*

---

[18] Greer does not deny that the FBI memo was turned over in discovery. In any event, the record reflects that Greer's trial counsel had seen the memo by the time of trial. In his questions to Shields, counsel mentioned the interaction between Shields and Greer described in the memo, referred to the exact date of the memo, and mentioned Agents French and Butler.

The government's position that Greer's trial counsel had seen the June 1, 2001 letter, with its mention of a payment to Shields, is supported by the record. As set forth above, Greer's trial counsel specifically asked Shields whether Greer told him "word's out on the street that you got $3500 from the FBI."[19] RT Feb. 9, 2006 at 7337. Thus, it is apparent that defense counsel was aware of the pertinent information and able to use it on cross-examination.

The government argues that Greer has waived this claim by failing to raise it on appeal. ECF No. 1184 at 90. This court agrees. It is clear from the record, as described above, that Greer was aware of these issues at trial. His failure to raise them on appeal constitutes a waiver of the claim in this § 2255 motion. *Frady*, 456 U.S. at 168, *Sunal*, 332 U.S. at 178.

But even if the claim had not been waived, it lacks merit. "[W[here the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense." *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)).[20] At the very least, Greer's trial counsel had enough information to alert him to the fact that Shields had been compensated for his cooperation and to seek these documents through discovery. *See Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (when the defendant is aware of essential facts enabling him to take advantage of any exculpatory evidence, "the government's failure to bring the evidence to the direct attention of the defense does not constitute 'suppression.'"). Counsel was not only alerted to it, he used it in

/////

---

[19]     The letter clearly specifies that the relevant amount was $3150. ECF No. 1184-7. It is unclear whether reference to the 3500 dollar amount was an error or merely an exact recounting of what Greer purportedly asked Shields.

[20]     In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *See also Bailey v. Rae*, 339 F.3d 1107, 1113 (9th Cir. 2003). The duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence. *Bagley*, 473 U.S. at 676. Failure to disclose a promise of benefit to a witness in exchange for cooperation with the government constitutes a due process violation. *Giglio*, 405 U.S. at 153-55.

cross examination.  Accordingly, Greer has failed to show that the information was "suppressed" by the government.

### 5. <u>Claims Raised in the Traverse</u>

It is not entirely clear whether Greer's traverse contains claims that were not raised in his original § 2255 motion.  To the extent Greer is attempting to belatedly raise new claims in the traverse, relief should be denied.  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (a traverse is not the proper pleading to raise additional grounds for relief); *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued specifically and distinctly in a party's opening brief").  Even if new claims contained in the traverse had been properly raised, Greer has failed to demonstrate that federal constitutional error at his trial or before his trial violated his right to due process or any other federal constitutional right.

**VI. Conclusion**

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED that Greer's motion to set aside, vacate, or correct his sentence pursuant to 28 U.S.C. § 2255 (ECF No. 1126) be denied; and

2.  The Clerk be directed to close the companion civil case: 2:12-cv-00397-MCE-EFB.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections Greer may address whether a certificate of appealability should issue in

/////

/////

the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section 2255 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  August 9, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE